UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
Case No. 26-cv-60913-DMM

HEATHER SPELL and
CARLA JOZA,

      PLAINTIFFS,

      vs.

RECSOL RECOVERY
SOLUTIONS, LLC
and TAYLOR N. HATCH *in her
official capacity* AS SECRETARY OF
THE DEPARTMENT OF
CHILDREN AND FAMILIES, and
THE DAVID LAWRENCE
CENTER,

      DEFENDANTS.

## AMENDED COMPLAINT[1]

## DEMAND FOR JURY TRIAL

COMES NOW, Plaintiffs, Heather Spell, and Carla Joza, by and through their attorneys, and brings this lawsuit seeking injunctive and declaratory relief, and monetary damages against RecSol Recovery Solutions, LLC, Taylor N. Hatch *in her official capacity* as Secretary of The Department of Children and Families, and The David Lawrence Center, for violations of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (Section 504), the Affordable Care Act (ACA) and other civil rights violations.  Defendants failed to provide meaningful access to

---

[1] Amended to reflect proper name of Defendant,  formerly listed as Well Path Holdings, Inc. Also amended for minor editing and to reflect additional factual information obtained from recently received medical records for services provided at the end of 2025.

services, improperly segregated Plaintiff, and denied Plaintiffs full and equal enjoyment of Defendants' services, facilities and privileges. Defendants also failed to make reasonable modifications in policies, practices and procedures and failed to train personnel to work effectively with Deaf patients. Defendants also failed to provide treatment in the least restrictive environment and failed to provide sufficient services in the community, resulting in improper and elongated institutionalization at state operated hospitals and other overly restrictive settings.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the actions pursuant to 28 U.S.C. §§ 1331, 1343, for the Plaintiffs' claims arising under the ADA, Section 504 and ACA.

2. The Court may assert supplemental jurisdiction over the state law claims because they are so related to the ADA, Section 504 and ACA claims that they form part of the same case or controversy under Article III of the Constitution. See 28 U.S.C. § 1367.

3. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 (b)(1) – (b)(2) because: (1) the Defendants are located in this district, and or (2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring within this district.

## PARTIES

## PLAINTIFFS

4. Plaintiff, Heather Spell (Ms. Spell), is Deaf and uses American Sign Language (ASL) to communicate. Ms. Spell is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12131 (2), the Rehabilitation Act, 29 U.S.C. § 794 and the Affordable Care Act, 42 U.S.C. § 18116. Her resident county varies as she is placed in different facilities in Florida, she is currently in Lee County.

5. Plaintiff, Carla Joza, is the mother of Ms. Spell, and has also been

appointed as Ms. Spell's Medical Guardian, and Representative at times during Ms. Spell's mental health treatment. Ms. Joza is not disabled but is a companion, as defined by the ADA, and has been affected by the Defendants' discriminatory actions. Ms. Joza is a resident of Collier County, Florida.

## DEFENDANTS

### RecSol Recovery Solutions, LLC.

6.      Defendant, RecSol Recovery Solutions, LLC (RecSol) was the operator of the South Florida State Hospital. RecSol is a private entity which contracts with DCF.

7.      RecSol is a place of public accommodation, pursuant to 42 U.S.C. § 12181(7)(F) and is subject to the mandates of Title III of the ADA and its implementing regulations.

8.      RecSol accepts Medicaid and Medicare, and is therefore, a recipient of federal financial assistance subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

9.      The operations of RecSol are programs or activities within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(b)(1)(B).

10.      RecSol is principally engaged in the business of providing health care and is covered by Section 1557 of The Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

### Taylor N. Hatch *in her official capacity* as Secretary of The Department of Children and Families

11.      Defendant, the Department of Children and Families (DCF) is designated as the Mental Health Authority of Florida. DCF is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1).

12.      DCF receives federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794 (a). The DCF public behavioral health system is

funded by federal block grant dollars and the Florida Legislature. *Found at* https://www.myflfamilies.com/services/samh/adult-mental-health (last visited May 12, 2026).

13. The operations of DCF are programs or activities within the meaning of the Rehabilitation Act, 29 U.S.C. § 794 (b)(1)(A)-(B).

14. DCF is principally engaged in the business of providing health care and is covered by Section 1557 of The Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

15. DCF directly operates the Northeast Florida State Hospital in Macclenny, Florida.

16. DCF owns the South Florida State Hospital facility and contracts with RecSol Holdings, Inc. to operate the mental health services at the facility.

17. DCF contracts with the David Lawrence Center to provide an in-patient Crisis Stabilization Unit and out-patient Florida Assertive Community Treatment (FACT) teams.

18. DCF contracts with Park Royal Hospital to provide mental health services.

19. DCF contracts with the Peace River Center to provide mental health services.

20. DCF contracts with Magnolia Assisted Living to provide mental health and housing services.

21. DCF contracts with Lakeland Regional Medical Center to provide mental health services.

22. DCF contracts with SalusCare to provide mental health services.

23. DCF contracts with Centerstone to provide mental health services and FACT teams.

24. DCF contracts with Charlotte Behavioral Health Care to provide residential treatment for addiction and mental health services.

**The David Lawrence Center**

25.     Defendant, The David Lawrence Center (DLC) is a private entity which contracts with DCF.

26.     DLC  is a place of public accommodation, pursuant to 42 U.S.C. § 12181(7)(F) and is subject to the mandates of Title III of the ADA and its implementing regulations.

27.     DLC accepts Medicaid and Medicare, and is therefore, a recipient of federal financial assistance subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

28.     The operations of  the DLC are programs or activities within the meaning of the  Rehabilitation Act, 29 U.S.C. § 794 (b)(1)(B).

29.     The DLC is principally engaged in the business of providing health care and is covered by Section 1557 of The Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

## Florida's Mental Health Care System

30.     The Department of Children and Families (DCF) is the state agency designated as the Mental Health Authority of Florida and is responsible for the planning, evaluation, and implementation of a complete and comprehensive statewide program of mental health, including community services, receiving and treatment facilities.

31.     DCF provides mental health services through a range of venues to include placement in highly restrictive state hospitals to less restrictive community services by way of  Florida Assertive Community Treatment (FACT) teams.

32.     DCF, through its public and private contractors, and managing entities are responsible for arranging placement and supportive care, as well as developing a plan to have individuals treated and discharged from facilities.

33.     The services provided to individuals experiencing mental health issues vary depending upon their status. Florida Statute § 394.463 requires individuals who are experiencing a behavioral health crisis be taken to a DCF designated receiving

facility for mental health evaluation and treatment. These centers are also known as Baker Act[2] receiving facilities.

34.     Baker Act receiving facilities provide emergency mental health services but are not designed or equipped to provide long term care. Baker Act receiving facilities can be located in a hospital, a Crisis Stabilization Unit (CSU) and a Short-Term Residential Treatment (SRT) facility.

35.      A Crisis Stabilization Unit (CSU) is a licensed Baker Act receiving facility, and provides brief psychiatric intervention, primarily for low-income individuals with acute psychiatric conditions. Inpatient stays average three (3) to fourteen (14) days at a CSU.

36.     Short Term Residential Treatment Facilities (SRT) provide a step-down for patients of CSUs needing a more extended, but less intensive level of active treatment for psychiatric conditions.  These programs were created to fill a service gap between CSUs and residential treatment facilities.

37.     An individual requiring extended or continuing care can be sent to the most restrictive environment, a state hospital, but only when the care needed is not available in the community.

38.     Patients are admitted to the state hospitals by way of a network of receiving  facilities like the CSUs or SRTs and are sent either voluntarily or by means of judicial order.  Ms. Spell was committed to two (2) state hospitals.

39.     Under the umbrella services offered by DCF individuals can also receive mental health services in the community through Florida Assertive Community Treatment (FACT) teams. FACT teams provide comprehensive community-based treatment to persons with serious mental illness.

40.     FACT is a self-contained mental health program made up of multidisciplinary mental health staff who function as part of a team. This team

---

[2] The Baker Act is also known as the Florida Mental Health Act. Fla. Stat. § 394.451.

provides the majority of an individual's treatment that is needed to achieve identified goals. The multidisciplinary team is supposed to ensure integrated and ongoing intensive treatment that is individualized and includes assessment, rehabilitation, and community support services.

41.     Ms. Spell has been a FACT member since 2020 and continues to receive services from FACT.

42.     Regardless of where a Deaf individual like Ms. Spell receives services for her mental health treatment, the providers must comply with the anti-discrimination statutes which prohibit discrimination based on disability.

43.     One form of prohibited discrimination is the "unjustified institutional isolation of  persons with disabilities[.].[3] This prohibition is largely implemented through two regulations: the integration mandate and the methods of administration regulation. The integration mandate requires states to "administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. §35.130 (d).

**The DCF Statewide Auxiliary Aids and Service Plan, a façade of compliance.**

44.      Stemming from past litigation against DCF brought by  Deaf individuals, DCF, and its contractors, are required to ask Deaf individuals in writing, which reasonable accommodation is required for effective communication. The Deaf individual identifies the accommodation effective for them through the use of  a "Customer or Companion Request for Free Communication Assistance or Waiver of Free Communication Assistance." (DCF Interpreter Form).(Exhibit A).

45.     The contractor must also complete a "Customer or Companion Communication Assessment and Auxiliary Aid Service Record" (Communication Assessment Record) to confirm the granting or denial of the request.  (Exhibit B).

---

[3] *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

46.     DCF provides a sampling of communication exchanges which would be considered "Aid-essential" and require an ASL interpreter. (*See* DCF 2019 Statewide Auxiliary Aids and Service Plan). [4]   DCF also requires the use of *certified* interpreters, which is defined as one who holds certification from the Registry of Interpreters for the Deaf (RID) or other national or state interpreter assessment program. *Id.* at pp.11, 17.

47.     DCF has designated Statewide Civil Rights Officers/Section 504-ADA Coordinators (504/ADA Coordinators) who are responsible to oversee compliance with the ADA and Section 504, and because of past litigation, must have a *specific emphasis* on accommodating Deaf and hard of hearing individuals.

48.     DCF Contractors must assign a DCF Contract Agency Single Point of Contact (SPOC) to act as the liaison to the DCF  504/ADA Coordinators. The SPOC must ensure Deaf individuals shall be asked for the type of accommodation that is effective through use of the DCF Interpreter Forms, provided certified interpreting services, and summarize their records and report to DCF.

49.     According to the DCF Communication Assessment Record, **"**Denials [of the requested accommodation]  should only be made for non-aid essential communication. However, staff must still ensure that effective communication is achieved through whatever alternative means are provided. Denial determination can only be made by Regional Director/Circuit Administrator/Hospital Administrator or their Designee or the Contracted Client Services Provider or their Designee." (Exhibit B).

50.     DCF contractors must provide a monthly "Report for the Deaf and

---

[4]  DCF    2019    Statewide    Auxiliary    Aids    and    Service    Plan,    *Found    at* *https://www.myflfamilies.com/documents/2506.pdf , pp*. 34-35 (last visited May 12, 2026).

Hard-of-Hearing" to DCF and their managing entity, which are submitted on the DCF website each month. This report must include the denials of interpreters as indicated on the DCF Communication Assessment Record.

51.    The DCF 504/ADA Coordinators are required to analyze the data found on the DCF Interpreter Forms and Communication Assessment Record in the reports and implement corrective action plans if warranted and remain in contact with DCF contractors in their region.

52.    Contractors of DCF are required to execute an attestation to confirm they are aware of the statutory and contractual requirements to effectively accommodate Deaf individuals.

53.    But this system is a façade. In the thousands of pages of medical records for Ms. Spell, some contractors used these DCF Interpreter Forms, others did not. The forms that are in her file consistently indicate that Ms. Spell repeatedly requested an ASL interpreter. The records also show ongoing and blatant denials of requested interpreters with no notation in the record as to a basis for a denial. Along with significant use of non-certified interpreters.

54.    The denial of the interpreters and the ineffective use of Video Remote Interpreting was known by officials at these mental health centers who had the authority to address the discrimination and to institute corrective measures on the entity's behalf. The records reflect the denials were made by psychiatrists, medical doctors, acute care directors, facility managers, risk managers, nurses and administrators, who failed to adequately comply even after Ms. Spell and her mother submitted requests for ASL interpreters.

55.    In addition to the DCF Interpreter Forms being sent to DCF, Fla. Stat. § 394.463 requires that DCF be notified within five (5) working days if an individual is subjected to an Ex-Parte Order for involuntary examination, a Law Enforcement officer initiates and involuntary examination, a Professional initiates an involuntary examination or an individual receives transportation to a Receiving Facility.

56.     The notification to DCF requires copies of the initiating examination documents and copies of the Notice of Transportation to a Receiving Facility be submitted. The forms must be uploaded to the DCF Baker Act Reporting Portal.[5]

57.     This Complaint outlines how Ms. Spell was Baker Acted more than thirty (30) times, sometimes by law enforcement other times by a professional who initiated an involuntary examination or by transportation to a receiving facility. Many of the documents uploaded to the DCF portal identify Ms. Spell as being "deaf," "communicating in sign language," "using sign," and or denote "writing with her" because she is deaf.

58.     The receipt of the DCF interpreter forms in tandem with the "deaf" identifying monikers on the initiating examination documents, along with the DCF 504/ADA Coordinators' responsibility to review the forms show that DCF officials were aware of these ongoing violations and looked the other way. Compounded by the fact that Ms. Spell was Baker Acted thirty-one times and received mental health services from at least nine different DCF providers, two of which were state hospitals owned and or operated directly by DCF.

59.     Florida does not invest in accessible mental health services for Deaf individuals. Florida is one of the few states in the country that does not offer a mental health treatment program or system with mental health providers who are trained to work with Deaf patients, or can communicate in American Sign Language, nor trained to address the trauma and life experiences unique to a Deaf patient.

60.     Florida does not offer incentives or support to ensure that the state's network of providers can properly serve Deaf individuals with behavioral health disabilities in the community and in institutional settings.

61.     Ms. Spell's mother Carla Joza has been advocating for her daughter for

---

[5] Prior to July 1, 2023,  it appears the forms were faxed or sent electronically to DCF.

years, trying to get Ms. Spell into a facility or community supported service providing equitable and accessible services for her Deaf daughter. Since 2020 she has been told that entities in the state system cannot be forced to accept or treat a Deaf patient if they require ASL interpreters.

62.    Ms. Spell's case is a tragic saga of a Deaf woman warehoused through almost every facet of an inaccessible mental health system which continually failed to meet her needs and blatantly documented their failure throughout her medical records then reported it to DCF, who did nothing.

## FACTUAL ALLEGATIONS

63.    Heather Spell (Ms. Spell) was born in Naples, Florida and attended the Florida School for the Deaf and Blind in St. Augustine, Florida.

64.    Ms. Spell has three minor children, and her parental rights have not been terminated. Two of the three children are being cared for by her mother Carla Joza, and the other child is being cared for by another relative.

65.    Ms. Spell's goal is to be able to return to a level of mental health so she can participate in her children's lives.

66.    Ms. Spell is a Deaf individual, who uses American Sign Language (ASL) to communicate effectively. Due to her mental health disabilities, attempting to communicate with her by writing exacerbates her condition.

67.    Ms. Spell can speak to some degree, but she is profoundly deaf in both ears. She reads and writes at an approximate sixth grade level. Under ideal conditions, she can only lipread approximately 50% of what is said. She can more easily lipread single words than full sentences, and her lipreading ability declines quickly if she is experiencing mental health symptoms, fatigue or medication side effects.

68.    When Ms. Spell was a young child, she was implanted with a Cochlear Implant (CI). A CI is a device implanted in the head and designed, in theory, to allow individuals to hear better. But Ms. Spell's CI has a very long history of malfunctioning and has been completely broken for at least five (5) years.

11

69. Ms. Spell also requires glasses due to her vision loss, and throughout her treatment she was often without glasses and had difficulty watching the small video remote interpreting (VRI) screens.

70. Ms. Spell has been diagnosed with various mental health conditions which include Post Traumatic Stress Disorder (PTSD) and schizoaffective disorder.

71. From March of 2022 to December of 2025 Ms. Spell was Baker Acted thirty-one (31) times to facilities that consistently fail to provide meaningful access for Deaf patients with behavioral health issues.

### A. Video Remote Interpreting (VRI) is not an effective standalone accommodation in a mental health setting.

72. Video Remote Interpreting (VRI) is a fee-based service provided through an internet-connected machine, wherein an ASL interpreter is located remotely and transmitted through a portable device (iPad, cell phone, laptop etc.). Approximately eight of the mental health care providers used VRI by way of a small iPad tablet for the medical exchanges during Ms. Spell's treatment.

73. The deficiencies of using VRI are well documented in Ms. Spell's medical records and supported through extensive literature and research. VRI is prone to connectivity issues, freezing, stopping, blacking out, or having the VR interpreters reporting they are unable to hear what individuals are saying and unable to keep pace with speakers without someone directing communication traffic.

74. VRI service is not regulated by the state or the federal government, resulting in no oversight to protect Deaf people from unscrupulous or unqualified VRI providers. The credentials of the "interpreters"[6] provided through VRI in Florida are not subjected to any form of local, state or federal oversight.

---

[6] Throughout the Complaint the term "interpreter" is used, however the records do not reflect that all the individuals used are "interpreters" who satisfy the definition of a qualified interpreter pursuant to 28 C.F.R. §35.104, 28 C.F.R.§ 36.104, or DCF's definition.

75.     As the medical records at each facility reflect, Ms. Spell was subjected to many different individuals called "interpreters" who held no form of credentialing or certification as required by DCF.

76.     In the mental health context, if VRI is used it should be as a *supplemental* accommodation because it is not suitable for complex and sensitive discussions with patients who are undergoing serious mental health symptoms like Ms. Spell.

77.     Compounding these issues with VRI, was the fact that Ms. Spell was often without her glasses at these facilities and reported having difficulty watching the small iPad screen.

### B. The David Lawrence Center (DLC)

78.     The DLC is a Managing Entity for DCF and offers a Crisis Stabilization Unit (CSU) and has a FACT team.

79.     After already experiencing many prior Baker Act commitments, in March 2022, Ms. Spell received services through the DLC CSU and its FACT team in Collier County.

80.     The DLC FACT team serves adults with severe and persistent mental illness, who may also have co-occurring abuse disorders. The program's multidisciplinary staff obtain or directly provide all mental health services to persons served, primarily in their homes or the community, including psychiatric care; medical referral and follow-up; individual supportive therapy, crisis assessment and intervention; substance abuse services; work-related vocational services; support in activities of daily living; social, interpersonal relationship and leisure time training; case management services and supportive services.

81.     During each of Ms. Spell's ten (10) commitments to the DLC CSU, and when discharged and provided services through the DLC FACT team, interpreting services were rarely provided. When provided the interpreting services were limited to VRI, unless Ms. Spell's mother secured an onsite interpreter.

82.     The DLC CSU also failed to provide Ms. Spell telephone access. Each of

the ten (10) times Ms. Spell was committed to the DLC CSU, Ms. Spell must execute documents which explain her rights, including the right to call advocacy organizations to report mistreatment or concerns. But the CSU does not have a videophone (VP) which allowed Ms. Spell to call these organizations for help. Nor do they provide any form of an accessible telephone to call family or friends.

**Baker Act One - Committed by Baker Act to the DLC Crisis Stabilization Unit March 6, 2022, to April 18, 2022 - 43 day commitment.[7]**

83.     On March 6, 2022, Ms. Spell began having delusional thoughts and other mental health  symptoms.  Ms. Spell was then admitted, according to DLC, for her ninth admission to the DLC CSU. DCF was informed of her admission.

84.     Although CSUs are to provide brief psychiatric service, normally no longer than fourteen (14) days, Ms. Spell remained at the facility for approximately forty-three (43) days.

85.     Soon after admission Ms. Spell executed a contract with the DLC outlining the services she would receive.

86.     Upon each admission, a treatment plan is developed, whose contents remained generally the same for each of her ten (10) admissions to the DLC CSU. The treatment plan generally required Ms. Spell to meet with the doctors about her treatment and medication, to participate in assessments (physical, mental health-based, depression screenings, violence screenings etc.), participate in at least three (3) to four (4) groups sessions per day and it required interactions with many other staff members.

87.     DLC  documents in this Baker Act commitment, and the ones to follow,

---

[7] Plaintiffs have made every effort to ensure the dates provided in the Amended Complaint are correct, but had to rely on an extremely high volume of medical records that required review with dates which sometimes conflicted with each other.

that it shall contractually "provide ongoing safe and therapeutic environment/safe milieu. Administer ordered medication at the most effective minimal dosage, encouraged participation in educational, wellness and other therapeutic groups." "Encourage interaction with staff and other clients as appropriate." "…educate on availability of PRN [ pro re nata e.g. as needed] medications and appropriate proactive and use." Along with providing "emotional support and reassurance."

88.     During each of the ten commitments Ms. Spell was required to interact with many different health care providers both day and night. Most days reflect more than ten (10) individuals providing some form of care. She had to also interact with the other patients whose number and composition change daily as they are admitted and discharged from the facility.

89.     During this commitment, Ms. Spell received ten (10) different medications to include the administration of psychotropic medications.

90.     The CSU presented Ms. Spell with the DCF Interpreter Forms, wherein she executed written requests for her need for an ASL interpreter. Yet even with voluminous written requests, interpreters were still denied.

91.     Ms. Spell also refused at times to execute the DCF Interpreter Forms because she felt the forms held no weight since they did not result in the provision of interpreters.   At one point, Ms. Spell refused to sign a DCF Interpreter Form and asked for an onsite interpreter by indicating: "Please get me physical Interpreter so I can get up and do what learn (sic) to get better."

92.     During this admission, like the ones to follow, she was rarely provided interpreting services. ASL interpreters were only provided for very limited interactions through VRI. The records show the absence of interpreters, and issues with using VRI.

93.     It was strongly recommended that Ms. Spell  participate in her medication management meetings and participate in the daily three to four groups sessions. A patient's refusal to participate in the meetings and the groups was seen as an act of non-compliance, or a refusal to engage in the treatment.

94.     But VRI interpreters were only provided occasionally for the medication management meetings and on rare occasions for group sessions. The VRI was not effective for these meetings/sessions with multiple people, especially in the group sessions when Ms. Spell or the other patients were engaging in non-compliant behavior, experiencing episodic symptoms, and responding to internal stimuli.

95.     Ms. Spell reports the attempted use of VRI for group sessions was ineffective because it required her to look down at the small iPad screen while individuals were talking. The technology caused a disconnect with her treatment, because the device prohibited the ability to maintain eye contact with other patients especially in group settings which made it very hard to follow who was talking in the room.

96.     At times, group sessions would be held outside in a courtyard, and these sessions were fraught with VRI transmission issues due to signal range. As a result, often the accommodation of VRI was not attempted, leaving Ms. Spell excluded from the group.

97.     The records reflect when the VRI failed, Ms. Spell became agitated and anxious, which triggered her mental health symptoms. When the exchange of medical information had to stop because the VRI device had to be restarted, Ms. Spell was often subjected to a different interpreter than the one who was just on the screen.

98.     Many of the VR interpreters did not sign clearly and Ms. Spell had difficulty expressing herself in a natural way while battling her mental health symptoms and medication side-effects. During this commitment, and the ones to follow, the lack of consistency in the interpreting services caused unnecessary confusion and constant disconcertment.

99.     DLC documented her requests to be provided with *on-site* interpreters for groups instead of VRI interpreters, but her requests were ignored. DLC acknowledged the deficiency of communication by indicating that Ms. Spell "is attempting to participate in the groups best she can due to her disability of deafness." Even Ms.

16

Spell's doctor confirmed in her medical records "She did better when (sic) ASL Interpreter could communicate with her."

100.   During this admission, and the ones to follow, DLC acted as a gatekeeper and automatically denied interpreters for group sessions or other interactions it believed did not warrant an interpreter.

101.   By way of example one note indicates "Client asked for interpretation services for the exercise group, but interpretation was not needed for this group due to the nature of the group as it was only exercise with no verbal direction needed." (emphasis added).

102.   This denial fails to consider the need for an interpreter for Ms. Spell to talk with the other patients, the group leader, and excludes her from the group leader's explanation about how the exercises can help abate her mental health symptoms.

103.   Treatment is to be provided twenty-four (24) hours per day, seven days per week. The records show that Ms. Spell attempted to engage in interactive exchanges of medical information at all hours of the day and night which were thwarted due to the absence of interpreters and trained staff.

104.   During this admission, and the ones to follow, records indicate Ms. Spell was denied interpreters for many important nursing interactions when exhibiting episodic symptoms throughout the day and late at night. The treatment plan requires the nursing staff to try to redirect patients in distress, but often the communication barrier could not be overcome and staff was unable to redirect.

105.   By way of example, one incident occurred at 11.30 pm when Ms. Spell was delusional and reported her stepfather had a gun and she was afraid for the safety of her family. Ms. Spell then fell back onto the floor and began shaking.

106.   The staff did not know ASL, nor did they attempt to offer any effective accommodation to assist in engaging in an exchange to address her delusional fear for the safety of her family.

107.   Ms. Spell  was unable to call family, friends or seek protection from

17

advocacy groups as required by statute because the DLC CSU did not have a videophone for her use. As a result, Ms. Spell would try to use the *regular* phone to call her mother but could not hear if or when her mother answered the call.

108.   Another common thread in the DLC records indicate how Ms. Spell was interacting minimally with her peers and often isolating from the group.

109.   Ms. Spell found comfort in pacing the floor due to the lack of communication and the feeling of being alone. Unfortunately, the medical staff documents her pacing as a negative manifestation of her condition instead of a moniker of language deprivation.

110.   Ms. Spell was unable to engage in bi-directional and comprehensive conversations with staff and other individuals and reports she was the only Deaf patient at the facility. It was extremely isolating and exacerbated her condition.

111.   Her isolation as a Deaf patient grew to a degree where she began making specific requests to see or talk to other Deaf people.  The requests were documented in her medical record, but no efforts were made to send her to a facility with other Deaf people, or one that was accessible to Deaf patients, or that had trained Deaf staff.

112.   Her mother shared her concerns with DLC about Ms. Spell being the only Deaf patient, and the need for services designed to include Deaf people. Ms. Joza shared potential resources about other Deaf service centers, or Deaf tailored services for the DLC to explore. But Ms. Spell is never treated at a facility trained to work with Deaf patients or provided access to those services.

113.   The segregation was compounded by the woefully untrained staff who are not equipped to work with Deaf patients. By way of example, DLC claims it was providing Ms. Spell an accommodation by allowing her access to her Cochlear Implant (CI), believing it will help her hear better.  DLC  indicates it  "allowed her to use her  CI [Cochlear Implant] while awake needs to turn in med pass and pick up am med pass."

114.   Notes are made in her medical records that Ms. Spell is using the

Cochlear Implant as accommodation. But the CI had been broken for years, and Ms. Spell is profoundly deaf in both ears.

115.   On April 18, 2022, Ms. Spell was discharged, and DCF was informed of her discharge. At the end of this admission, like the ones to follow in this Complaint, DLC would note Ms. Spell had "reached the full benefit of her CSU stay."

116.   After being discharged, the DLC FACT team and medical staff sent Ms. Spell to live at the Serenity Sober Home in Cape Coral, Florida.

117.   Interpreters were not provided at the Sober House to explain the rules or procedures,  and the facility was not equipped with a videophone.

118.   After arrival, Ms. Spell eloped from the Sober Home and unfortunately engaged in drug use. Upon her return to the sober house, due to the lack of interpreters, the staff was unable to communicate with her, and Ms. Spell became confused and very upset.

119.   Without the provision of an interpreter, the Sober House demanded her immediate removal, and Ms. Spell's mother had to pick her up in the middle of the night before she was thrown out on the street.

### Baker Act Two - Committed by Baker Act to the DLC  April 19, 2022, to June 13, 2022- 55 day commitment.

120.   The next day, April 19, 2022, Ms. Spell was again involuntarily admitted to the DLC CSU under the Baker Act, and DLC notes this is her tenth admission. DCF was informed of this tenth admission.

121.   Soon after admission Ms. Spell executed a contract with the DLC outlining the services she shall receive.

122.   The DLC noted in her medical records that at this point she has had more than "twenty (20) psychiatric inpatient visits." Even with that backdrop DLC offered the same treatment plan as prior (and future) admissions, denied qualified ASL interpreters, and when  interpreters were provided it was only through VRI.

123.   During this admission, as in prior admissions, and shall be in future admissions, the medical records reflect written affirmative requests by way of the DCF Interpreter Forms for qualified interpreters.

124.   Ms. Spell was once again the only Deaf person at the facility, and she was isolated and segregated.

125.   As in the past when VRI was offered for group sessions it was not effective. Ms. Spell often left the group sessions because she could not effectively participate or understand through the use of VRI.

126.   During the rare instances when VRI was used, like prior admissions, she was subjected to many different VR interpreters which created inconsistency in treatment.

127.   During some VRI interpreted sessions the interpreter would tell Ms. Spell she "ended her shift," which required the session to terminate immediately.

128.   The facility still does not offer a videophone for Ms. Spell to contact her family or friends or invoke her legal right to call state designated advocacy agencies if needed.

129.   Interpreters are not provided for her interactions during nursing assessments. The records reflect Ms. Spell was forced to write during those assessments, and sadly in those same records DLC indicates that Ms. Spell is having a hard time writing back and forth to explain how she is feeling.

130.   Interpreters were not consistently provided for the critical medication management meetings, and when they were, it was through a hodge-podge of VRI interpreters.

131.   On approximately April 20, 2022, Ms. Spell was told she needed more mental health care, but DLC says it cannot provide the care needed because of her deafness.

132.   Due to the fact that DCF did not provide accessible services for Deaf

patients and does not offer any program that could have meet her needs due to her deafness, she was to be sent to a state hospital. Ms. Spell objected to the placement, telling DLC the state hospital could not meet her communication needs.

133.   Ms. Spell was told she must stay at DLC until a bed was open at one of the most restrictive settings, the State Hospital in Pembroke Pines, Florida.

134.   On May 12, 2022,  Carla Joza  spoke at length with the medical staff about the deficiencies in Ms. Spell's care. Ms. Joza shared her concerns about the lack of communication for her daughter, and the need for onsite interpreters, and how that failure was not meeting her treatment needs as a Deaf patient.

135.   Ms. Joza also expressed her frustration with being unable to make or receive phone calls from her daughter, unlike the non-deaf patients who had ample access to the phone to talk with family members.

136.   To be helpful,  Ms. Joza explained the availability of the video relay service (VRS),  and how it provides telephone access through an interpreter, and is provided free of charge.[8] Ms. Joza told DLC they can obtain a videophone for free for Ms. Spell to use, or at least allow Ms. Spell to use her cell phone which has the VRS app[lication] already installed. But DLC failed to provide this service.

137.   DLC also denied the voluminous requests, already made by Ms. Spell, for "live" [onsite]  interpreters due to the "expense of scheduling."

138.   In June 2022,  Ms. Joza filed a formal complaint with the DLC,  wherein DLC acknowledged the denial of phone access and confirmed a delay in authorization for the use of Ms. Spell's cell phone to allow her to make videophone calls.[9]

---

[8] Video Relay Services are regulated by the Federal Communications Commission. See 47 U.S.C.§ 225.

[9] Calls made through VRS provide a free ASL interpreter for Ms. Spell, so that she can call anyone including those who do not know ASL. Allowing calls only through Facetime limits telephone access because although Ms. Spell can directly place Facetime calls, an interpreter is not provided through Facetime, and not everyone she wants to call or receive a call from is fluent in ASL.

139. DLC also stated it will begin using "in-person interpreters based on Treatment Team recommendations going forward." But when Ms. Spell returns in 2023 (after being released from the state hospital as outlined below) in-person interpreters were not provided.

140. With no place else to send Ms. Spell, on June 13, 2022, she is transferred to the State Hospital in Pembroke Pines. The building which houses Pembroke Pines is owned by DCF, and the mental health services provided therein is contracted by DCF to RecSol.

141. Ms. Spell would languish there for two hundred-and-fifty-three (253) days.

**Baker Act Three - Committed by Baker Act to the South Florida State Hospital (RecSol) June 13, 2022, to February 21, 2023 - 253-day commitment.**

142. From June 13, 2022, to February 21, 2023, for two hundred and fifty-three (253) days Ms. Spell remained at the state hospital operated by RecSol (also referred to as The South Florida State Hospital, SFSH). DCF was informed of the admission.

143. Soon after arrival Ms. Spell executed a contract with RecSol memorializing the services which would be provided to her, and which they shall seek reimbursement.

144. Upon arrival requests for ASL interpreters were made, and the medical records reflect written affirmative requests by way of the DCF Interpreter Forms for certified interpreters.

145. During the first day at the SFSH, Ms. Spell underwent extensive medical and mental health screenings and psychiatric evaluations but was only provided with an interpreter through VRI for approximately two (2) hours that day.

146. On her first day, the records show she had to interact with approximately fifteen (15) different health care providers. Almost all staff documented they "wrote" with the patient instead of providing an ASL interpreter.

22

147.    When admitted, Ms. Spell was taking eleven (11) different medications to include psychotropic medications.

148.    On or around June 24, 2022, RecSol developed a treatment plan but failed to provide a way for her to effectively communicate so she could benefit from this plan.

149.    The treatment plan changed throughout Ms. Spell's commitment but generally required monthly meetings with her treatment team to assess her progress, as well as monthly medication review, group sessions, weekly meetings with a psychiatrist and weekly individual psychotherapy sessions. The meetings and group sessions were attended by many patients, making VRI (when provided) ineffective.

150.    However, the treatment plan indicates that interpreters shall be provided for all "necessary" meetings only two times per week. The term "necessary" is not defined.

151.    In lieu of interpreters, the hospital provided a flex pen and note pad which was stored at the nurses' station because the pen was considered contraband, despite the fact that it documented that communication through pen and paper causes her to become "agitated fast."

152.    In lieu of interpreters, RecSol's ill trained staff also attempted to provide a Pocket Talker. This device is tailored for individuals who are hard-of-hearing and have some residual hearing because it only amplifies sound. This device is not effective for Ms. Spell because she is profoundly deaf.

153.    Medical doctors and/or ARNP's were to conduct physical examinations, order labs and provide treatment medication as deemed necessary. It was rare that an interpreter was provided for any of these interactions.

154.    The nursing staff were required to provide medication education and referrals to clinic as necessary, and Ms. Spell was to receive periodic physical and dental examinations and weight and dietary monitoring. It was rare that an interpreter was present for any of these interactions.

23

155.    Clinic visits and medication administration happened all through the day and night and into the early morning. Without interpreters, these interactions are missed opportunities for the staff to engage with Ms. Spell and help her with her mental health recovery.

156.    The treatment plan also required Ms. Spell to attend daily and weekly Illness, Management and Recovery (IMR) groups. The group sessions' topics ranged from educating Ms. Spell about her right to quality care, individual dignity and explaining the process of reporting abuse. RecSol documented her participation was limited because of the communication barrier. It is specifically noted that the "instructor is not fluent in ASL and ASL interpreters do not come to class" and that her participation is limited due to communication issues.

157.    Throughout her 253-day commitment, *when* interpreters are provided, they were only provided generally once during the day, for two hours or less, and primarily by way of VRI.

158.    Ms. Spell was subjected to the same problems with VRI as occurred at the DLC.[10]  RecSol was aware of the ineffectiveness of the VRI and documented the same in Ms. Spell's medical records.

159.    On June 29, 2022, Ms. Spell underwent a psychological assessment where the evaluator noted "It was difficult to obtain information throughout the interview due to the cumbersome nature of signing through an interpreter via Zoom." With one psychology practitioner noting on August 31, 2022, "communicating through an interpreter likely contributed to my difficulty in understanding." The therapy staff also documented Ms. Spell's preference for "in-person meetings with the interpreter," because it is more effective for her treatment.

160.    During this long commitment Ms. Spell was not afforded interpreters for

---

[10] As outlined in paragraphs 94-95, and 97-98 of this Complaint.

many other interactive exchanges of medical information. These interactions include but were not limited to: discussions about the side effects from her psychotropic and non-psychotropic medications, treatment team meetings, group sessions, medical evaluations, dental visits, X-rays, ultrasound examinations, ECGs (with abnormal results), injuries from assaults while at the hospital, medication administration, blood work discussions, and ongoing assessments used to  determine the activities she prefers to participate in to further her mental health while at RecSol.

161.   RecSol's refusal to ensure effective accommodations, and failure to possess the skills to properly treat a Deaf patient sabotaged Ms. Spell's success.

162.   Ms. Spell was told to be discharged she must be involved in activities to lessen her aggression but then ironically RecSol refused to provide interpreters so she can participate in activities.

163.   At all times of the day and night the patients are allowed to speak to staff about issues they are experiencing or report when they are not well. Ms. Spell's records indicate she sought help at all hours of the day and night, but those interactions offered no interpreters thereby preventing access to the 24-hour care provided in a residential treatment center.

164.   The barriers to communication and the barriers in the environment led to Ms. Spell being subjected to assaults by other patients. She was slapped in the face and involved in fights. In July 2022 her glasses were stolen with no replacement.

165.   In August 2022,  a patient who assaulted her also stole her clothes, including her shoes. Ms. Spell was later found in her room lying on a bare mattress with no pillow.

166.   During an August 2022 zoom call Ms. Joza saw that her daughter had a black eye, which was the second time she saw her daughter's face bruised by incidents at the SFSH.  In September 2022 Ms. Joza contacts RecSol to report that Ms. Spell is being bullied,  her items are being stolen and that her Deaf daughter is in danger and wants RecSol to investigate.

167. Ms. Joza also tells RecSol that the writing utensil and writing tablet that was forced upon Ms. Spell as an "accommodation" has been missing for some time.

168. RecSol is required to establish reasonable rules governing the use of telephones by patients in the least restrictive possible manner. Fla. Stat.§ 394.459 (5) (e).

169. Although hearing patients had liberal use of the telephone, RecSol did not have a videophone (VP) for Ms. Spell to place or receive calls to her children and family. A videophone would have allowed Ms. Spell to place calls as needed and be afforded a free ASL interpreter during the phone call through the video relay service (VRS). Instead, she had to seek permission from staff, who would then arrange a zoom call at a date and time convenient for the staff.

170. Ms. Joza impressed upon RecSol that allowing only one zoom call per week is a violation of the law, and that it does not provide the same phone access afforded to hearing patients.

171. Zoom calls created long delays, because the staff would have to contact the person Ms. Spell wanted to speak to and find out when they were available for a zoom call. Then make sure a staff person would be available at that time to set the laptop up for the Zoom call.

172. Up until August 2022 Ms. Spell was limited to one Zoom call per week, and at the whim of one social worker available to set the call. After Ms. Joza's continual persistence to speak to her daughter more frequently, Ms. Spell's Zoom calls increased but were still limited to three (3) times a week. These prearranged Zoom calls also removed the spontaneity of allowing Ms. Spell to call, or at least try to call, her mother when *she* wanted to reach out and talk to her mother.

173. The hospital is located too far away for visitation with her minor children, and the denied phone access augments the loneliness that the absence of interpreters and absence of other Deaf patients has created.

174.    Throughout the medical records the ill-trained RecSol staff noted Ms. Spell talked very loudly, to indicate some form of mental health symptom. But Ms. Spell is Deaf and cannot hear the volume of her voice. Her speech volume is a function of her deafness not a mental health condition.

175.    The medical records indicate how Ms. Spell continually complained about being unable to engage in activities or engage in dialogue with other individuals in the unit due to the absence of interpreters.

176.    As time went by Ms. Spell reported feeling incredibly isolated because there were no other Deaf  people, or people who knew ASL.  She explained how the isolation was exacerbating her mental health symptoms. Ms. Spell told the staff she looked forward to the meager times she is provided an interpreter so she can "connect with people" and "be understood" and how she feels that her "needs/wants which are often overlooked due to her inability to communicate."

177.    On November 9, 2022, Ms. Spell was finally able to speak to a Deaf friend through Zoom.  It is the first time in approximately eight to nine months she has spoken to another Deaf person. After the Zoom call, the staff noted "Ms. Heather was delighted to see her friend and it was the happiest staff has seen her."

178.    DCF's systematic refusal to provide meaningful treatment to Deaf patients is documented in RecSol's medical records. DCF does not offer services tailored to accommodate the needs of a Deaf patient and Ms. Spell faced that same barrier when trying to be discharged from RecSol.

179.    On approximately August 9, 2022, Ms. Spell was cleared for discharge. On approximately August 18, 2022, discussions were held about Ms. Spell's next placement, and the need to set interviews with potential receiving facilities. DLC FACT team members were involved in those discussions.

180.    On August 24, 2022, Ms. Spell was screened for placement in a group home, but on information and belief she was not provided with an interpreter for the interview. Ms. Spell was not accepted at the facility because they could not meet her

needs and because of "the client's acutely disorganized presentation during the screening."

181.   In September 2022, Ms. Spell was then interviewed by two (2) residential facilities, Adele Gilbert Residential Treatment Facility and Darlington Residential Treatment Facility[11] who denied her treatment because of the cost of ASL interpreters.

182.   Because no one would take Ms. Spell due to her deafness, the DLC FACT team and RecSol begin whittling away her substantive rights by requesting that Ms. Spell agree to "having a video interpreter once per week for a (sic) counselling, as well as once per month for her psychiatric appointments. We asked if she would be able to use lipreading and handwriting for all day-to-day interactions, as well as groups at the facility (2-4 hours per day of groups)."

183.   Ms. Spell and her mother knew such an agreement would result in the same warehousing and decompensation she had been subjected to for years in Florida. Thus Ms. Joza warns RecSol and the FACT team that VRI is not effective for group meetings and that on-site interpreters would be needed for some interactions. Further that formulating a plan to deny Ms. Spell's needed accommodations was improper.

184.   When Ms. Spell refused to give up her right to accommodations, the two treatment centers then changed their reasons for denial and stated they could not take Ms. Spell because she needs "drug treatment" and that they only provide "mental health" treatment. However, their own website description of their programs belies those false claims.

185.   Ironically, the Operation Par Program considered Ms. Spell for placement but deny her as well, indicating just the opposite--- she needs more "mental health" treatment than drug treatment.

186.   As a result, Ms. Spell was stuck at the state hospital even though she

---

[11] Both are contracted with DCF to provide mental health and substance abuse services.

was cleared for discharge in August. Then in November a recommitment hearing is held after RecSol petitions the Court to extend Ms. Spell's commitment. DCF is notified of the hearing and does nothing.

187. In December 2022 Ms. Spell is assaulted twice, one assault included her being punched in the head and receiving a black eye, which required treatment at a local emergency department. On information and belief, Ms. Spell was not provided with interpreters at the emergency department.

188. Frustrated by the delay in the discharge, on December 21, 2022, Ms. Joza sent an email message to the hospital case manager informing them that she knows of room for rent available, and that she would be willing to cosign for housing since Ms. Spell has been on the discharge list since August.

189. The hospital declined help from her mother and indicated they are exploring potential housing for Ms. Spell, but the housing won't be available until the beginning of February 2023.

190. In the email exchange Ms. Joza explained how her daughter is feeling abandoned at the hospital and feels hopeless because she can't be discharged because she is Deaf and requires accommodations.

191. While cleared for discharge on August 9, 2022, Ms. Spell languished at RecSol until February 23, 2023- even though she was stable and no longer met the criteria to be at a state hospital, or in any facility. Ms. Joza continued to advocate for other housing options and or to at least transfer her daughter to a mental health center closer to her family, to no avail.

192. Ms. Spell was finally discharged from RecSol on February 21, 2023, and released *out into the community*, not to another treatment facility. DCF was informed of the discharge.

193. During this admission, officials at RecSol and DCF were contacted about the ADA violations they were engaged in as to the treatment for Ms. Spell.

**February 21, 2023 – March 8, 2023 - Ms. Spell received services in the community from the David Lawrence Center FACT Team.**

194.    After being released from RecSol Ms. Spell was sent back to the David Lawrence Center in Naples to receive *outpatient* treatment from the DLC Collier County FACT team.

195.    The treatment plan included staff coming to her home two times a day for medication administration and required she attend weekly medication management meetings at the FACT center. The plan also provided individual therapy with a FACT therapist. DLC provided interpreters upon occasion at the center but only through VRI. But when the DLC FACT staff came to her home to provide services to promote her wellness and integration, interpreters were never provided.

196.    Ms. Spell must follow the treatment plan and remain drug free and maintain stable housing. Although recommended, Ms. Spell was unable to attend NA meetings because no one will pay for the ASL interpreting services.

197.    As was done before with the DLC Fact team, Ms. Spell and her mother continued to ask for interpreting services and staff trained to work with Deaf people so that she can avoid institutionalization. But the requests were denied.

198.    On March 6, 2023,  Ms. Spell complained to the staff that she is not "being heard," and that they are not "listening to her."

199.    Two days later Ms. Spell was Baker Acted again.

**Baker Act Four - Committed by Baker Act to the David Lawrence Center March 8, 2023, to March 10, 2023 - 3-day commitment.**

200.    At 2.45 am on March 8, 2023, Ms. Spell was found at a gas station threatening to cut herself. The Collier County Sheriff's Office was called, and she was Baker Acted by law enforcement back to the DLC CSU.

201.    No interpreter was provided for the exchange with the Collier County

Sheriff's Office.

202.   DCF was informed of her admission.

203.   DLC is familiar with Ms. Spell and knows she is Deaf because their records indicate this is her eleventh (11th) admission to their facility. But upon arrival she was not offered an interpreter for the clinical baker act assessment.

204.   Soon after admission Ms. Spell executed a contract with the DLC memorializing the services she would receive.

205.   Her medication management meeting is set for 9.00 am, but as soon as DLC turns on the VRI device Ms. Spell leaves the room, because according to the doctor "it seemed to upset her."

206.   Even though DLC has documented in the past that the use of the VRI exacerbates Ms. Spell's condition, and it agreed to provide onsite interpreters in 2022 prior to her commitment to the South Florida State Hospital,[12] it still provided only VRI.  Because DLC refused to hire onsite interpreters, for the remainder of the day Ms. Spell was forced to write and to try to lipread to communicate. Ms. Spell reported that she has been dissatisfied with her treatment and "feels unheard."

207.   The treatment plan for this commitment as in all others, states Ms. Spell must participate in treatment, participate in all clinical and medical assessments, identify ways to improve her own mental health, attend groups if offered and prepare for discharge.

208.   VRI failures were documented including during two medical management meetings, wherein DLC notes  "Boost Lingo ASL was  attempted but it failed to locate a video interpreter. We therefore wrote messages during the visit." There were at least five (5) people at these meetings, thus note writing was not an effective way for Ms. Spell to discuss her feelings and respond to questions from at

---

[12] See paragraph 139.

least five people. Especially since Ms. Spell was just found at a gas station threatening to harm herself with scissors.

209.  Like the prior admissions, when VRI was functioning, it subjected her to many different interpreters offering no continuity of service. Further it is reported she is without her glasses again.

210.  The facility still failed to offer a videophone to allow Ms. Spell to place phone calls to her family.

211.   On March 10, 2023, Ms. Spell was discharged without the assistance of an interpreter. DCF was informed of her discharge.

## March 10, 2023, - June 24, 2023 - Ms. Spell received services in the community from the David Lawrence Center FACT Team.

212.  Upon discharge Ms. Spell began again to receive services from the DLC FACT  team. She was housed once again with another roommate who is not Deaf nor knows ASL.

213.  Like before, Ms. Spell must allow the DLC staff to enter her home twice per day for medication administration. Interpreters were never provided for those mandatory interactions.

214.   Ms. Spell was  provided with individual therapy with a FACT therapist at the center, however DLC only provided interpreters some of the time and only through VRI which often did not work. Thus she cannot communicate her needs to the staff.

215.  Ms. Spell then began to look for employment and tried to stabilize her mental health. Ms. Spell asked FACT if she could attend anger management meetings, but her request was denied due to the costs of the interpreters.

216.  Ms. Spell tried to attend NA meetings, but no interpreter was provided for the meetings.

217.   While Ms. Spell was out in the community her mother visited her and called or texted her almost every day. Ms. Joza continued to provide as much  support as she could as she advocates for her Deaf daughter, while Ms. Joza works full time and is raising Ms. Spell's twin daughters.

218.   In May 2023 Ms. Spell began missing meetings at the DLC Fact center, as it was difficult to communicate with the staff. This led to issues with her substance addiction and her mental health.

219.   On June 24, 2023,  Ms. Spell was using substances and began talking to herself, and was alleged to have threatened her roommate, who called the police.

220.   The Collier County Sherriff's Office responded to the call and transported Ms. Spell to Naples Community Hospital. No interpreter was provided for the interaction with the Sherriff's Office.

221.   No interpreter was provided at Naples Community Hospital for the psychiatric evaluation. Ms. Spell was then Baker Acted to the Park Royal Hospital Behavioral Treatment Center in Fort Myers.

## Baker Act Five - Committed by Baker Act to Park Royal Hospital June 25, 2023, to July 1, 2023 - 6-day commitment.

222.   Ms. Spell was involuntarily committed to Park Royal Hospital (Park Royal) on June 25, 2023, and remained there for six (6) days. Park Royal is a contractor of DCF required to provide mental health services.

223.   DCF was informed of her admission.

224.   Soon after admission Ms. Spell executed a contract with Park Royal outlining the services she would receive.

225.   During the initial intake it appears an interpreter was provided by way of VRI for a short period of time. However, the nursing assessment was performed without an interpreter present.  Ms. Spell underwent a psychiatric evaluation upon arrival, and a subsequent second opinion evaluation without the provision of ASL

33

interpreters. Daily follow-up evaluations on her medication management also appear to indicate they have been performed without an interpreter e.g. "difficult to communicate" with her.

226. Park Royal drafted a treatment plan outlining the services it shall provide and in turn bill insurance. The treatment plan includes extensive medical exchanges with four general components: 1.) Physicians shall conduct daily rounds, and address patient's  psychiatric symptoms, 2.) Nurses shall monitor medications, 3.) Therapists will provide daily psychoeducational and process group therapy to assist patient processing and implementation of healthy strategies to decrease/eliminate disturbed thoughts; and 4.) Daily Art Therapy and Recreational groups shall be provided to promote stimulation through activities and to practice coping skills for emotional regulations.

227. The notes stressed the importance of her attendance in groups because they  provide her "social interaction" which helps with a safe discharge.

228. The medical records indicate Ms. Spell attended some group sessions, however many of them involved music therapy and watching movies, with some movies  not offer captioning. Ms. Spell was not provided with ASL interpreters with any regularity by the DCF contractor.

229. On June 27, 2023, Carla Joza tells Park Royal Ms. Spell requires an ASL interpreter for all her treatment. But that request was denied.

230. On June 27, 2023, a Petition for Adjudication of Incompetence to Consent to Treatment and Appointment of a Guardian Advocate was filed. The Department of Children and Families was notified of the hearing request.

231. A court hearing was set for July 7, 2023, for Ms. Spell's continued commitment. Pursuant to the Florida Rule of General Practice and Judicial Administration 2.540, the state court documents indicate if Ms. Spell needed an accommodation to participate during the hearing she could call the ADA Coordinator

for the state court. But Park Royal did not provide a videophone for her to place phone calls.

232.    At that court hearing two physicians were designated to testify as to Ms. Spell's need for commitment.  But neither of these two physicians evaluated Ms. Spell with the assistance of an ASL interpreter.

233.    Ms. Spell was discharged on July 1, 2023, and DCF was informed of her discharge.

234.     Ms. Spell's mother picked her up from the hospital, provided her dinner and then drove her back to her apartment. When they returned to Ms. Spell's apartment, they find Ms. Spell's roommate slumped over on the floor, dead from a drug overdose.

235.    Collier County Sherriff's Office was called, and they required Ms. Joza and Ms. Spell to stay at the scene while they investigated the death, this takes at least two hours.

236.    No interpreter is provided for the exchange with law enforcement, and Ms. Joza attempted to interpret for her daughter.

237.    Finding her roommate dead in her home was very traumatic, and as a result on the next day July 2, 2023, Ms. Spell called the Collier County Sherriff's Office through VRS to talk to someone about how she felt about finding her roommate dead in the apartment.

238.    The Collier County Sherriff's Office responded, but like the times before, an interpreter was not provided for the exchange with law enforcement. Ms. Spell was then transported to the DLC and Baker Acted again.

### Baker Act Six - Committed by Baker Act to the David Lawrence Center July 2, 2023, to July 6, 2023 - 4-day commitment.

239.    DLC reports this is her thirteenth (13th) admission to this CSU. DCF was informed of  her admission.

240.   Soon after admission Ms. Spell executed a contract with the DLC outlining the services she shall receive.

241.   The treatment plan is similar to the ones before, and as in previous admissions when interpreters are provided, it is only through VRI.

242.   Ms. Spell declined to use the VRI on several occasions during this commitment, because it states it aggravated her condition.  She experienced Wi-Fi reception and transmission issues with the VRI, and the device was abandoned because it was too hard to follow the dialogue during exchanges with more than one person present. VRI made her frustrated and she told DLC the same.

243.   Ms. Spell attended some group sessions during her commitment, but interpreters were not always provided.

244.    The medical records indicate Ms. Spell was very traumatized by finding her roommate dead and that she struggled to process the loss. Ms. Spell wanted to talk about the loss, but she was unable to do so due to the lack of accommodations. Ms. Spell is concerned that she will never become well.

245.   Further she could not call her children and family through VRS because the facility still does not offer a videophone.

246.   Ms. Spell was discharged on July 6, 2023, and DCF was informed of her discharge.

247.   The failure of DCF to provide meaningful access to mental health services continue to cause Ms. Spell to be warehoused through the system, with no end in sight.

**July 6, 2023 - July 9, 2023- Ms. Spell received services in the community from the DLC FACT Team.**

248.   Upon discharge Ms. Spell began again to receive services from the DLC FACT team.

249.   As in the past, Ms. Spell was required to interact with DLC staff twice

per day at specific times for medication administration and respond to all DLC staff inquiries about her compliance. DLC required attendance at weekly medication management meetings and would provide individual therapy with a FACT therapist.

250.    The DLC FACT team provided interpreters upon occasion but only through VRI.  Technical issues and the quality of the interpreting continued to be a problem. Ms. Spell is once again subjected to VRI failure and had issues communicating her needs to the staff. There are no interpreters provided for any mandatory home services.

251.    She reported to the FACT team that she was lonely and wanted to interact with other Deaf people.

252.    On July 9, 2023, a DLC FACT team employee noticed that Ms. Spell was acting strange and possibly having a mental health crisis. The Collier County Sherriff's Office was called for assistance.

253.    Ms. Spell had an exchange with law enforcement and the FACT Team member, but no interpreter was provided for the exchange.

254.    Ms. Spell was transported to the DLC CSU again to be Baker Acted.

**Baker Act Seven - Committed by Baker Act to the David Lawrence Center July 9, 2023, to July 11, 2023 - 3-day commitment.**

255.    DCF is informed of her admission, and for this *fourteenth* admission the treatment plan is similar to the last treatment plans.

256.    Soon after admission, Ms. Spell executed a contract with the DLC outlining the services she shall receive.

257.    During the meager times ASL interpreters were provided, they were only offered through VRI.  Ms. Spell's requests for onsite interpreters, or to receive treatment with other Deaf people are denied again.

258.    Like before, Ms. Spell would refuse to use VRI because it makes it hard

to engage in the way needed through the device.  The absence of onsite interpreters continued to cause ongoing aggravation and anxiety, especially when the device failed. To show her dissatisfaction with the ineffective accommodation, the staff reported at times Ms. Spell would purposely close her eyes instead of looking at the VRI.

259.   Ms. Spell attended approximately one group session during this admission, but the records make no mention of an interpreter being provided.

260.    The facility still did not offer a videophone to allow her to contact family or friends.

261.   On July 11, 2023, Ms. Spell was discharged and told she would receive services from the DLC FACT team again. The plan is for her to live in a Sober House with all hearing people, without interpreting service.

262.   DCF was informed of the discharge.

## July 11, 2023 - July 17, 2023 - Ms. Spell received services in the community from the  DLC FACT Team.

263.   Upon discharge Ms. Spell began again to receive services from the FACT team. She was placed in a hotel until housing can be found at a Sober House.

264.   The services the FACT team provides did not change.

265.   Interpreters, when provided, are only provided through VRI. The records reflect transmission failures with the device rendering it unavailable.  DLC still failed to provide interpreters for any of the services Ms. Spell received at home.

266.   While Ms. Spell is out in the community her mother visited her, and called or texted her almost every day. Ms. Joza continued to provide as much  support as she could as she advocated for her Deaf daughter.

267.   Ms. Spell was unable to attend Narcotics Anonymous meetings because ASL interpreters were not offered, nor would the FACT team secure the services.

268.   Early in the morning on July 18, 2023, after using substances,  Ms. Spell

voluntarily reported to DLC CSU seeking help because she was afraid she will hurt herself with a knife. DCF was informed of the admission.

**Baker Act Eight - Committed by Baker Act to the David Lawrence Center July 18, 2023, to  July 20, 2023 - 3-day commitment.**

269.    Upon her admission the records reflect the VRI device is down, and no interpreter was provided for her evaluation on this fifteenth (15th) admission to this CSU.

270.     Ms. Spell tried to explain her desire to stab herself, her hopelessness, loneliness and being unable to care for her children. These attempts were made without the benefit of an ASL interpreter.

271.    Soon after admission Ms. Spell executed a contract with the DLC outlining the services she shall receive.

272.    The treatment plan for this commitment was essentially the same as the fourteen (14) treatment plans used before this one.

273.    The meager times she was provided with an interpreter, it was always through VRI.

274.    The facility still did not offer a videophone to allow her to contact family or friends.

275.    Ms. Spell was discharged on July 20, 2023, without the provision of an interpreter.

276.    DCF was informed of the discharge.

277.    Ms. Spell then receives services from the FACT team in the community, and is housed at a trailer park with a hearing roommate who does not know ASL.

278.    On July 24, 2023, Ms. Spell used some substances, causing her mental health to decompensate. She was found wandering around the trailer park reportedly agitated and disoriented.

279.    The Collier County Sherriff's Office was called, and she was placed into

the police vehicle. No interpreter was provided for the exchange with the Sheriff's Office.

280.  Eventually a FACT team member arrived, and without the use of an ASL interpreter, determined that she met the criteria for a Baker Act. Ms. Spell was transported to DLC CSU and Baker Acted again.

**Baker Act Nine - Committed by Baker Act to the David Lawrence Center July 24, 2023, to September 7, 2023 - 45-day commitment.**

281.  DCF was informed of the admission, and the DLC records indicate this is her sixteenth (16th) admission.

282.  Upon arrival no interpreter was provided. Eventually the CSU attempts to use VRI, but due to Ms. Spell's symptoms she was unable to focus on the small screen to watch the interpreter.

283.  Soon after admission Ms. Spell executed a contract with the DLC outlining the services she shall receive.

284.  The treatment plan is essentially the same as all prior admissions, and she was still being administered several psychotropic medications.

285.  As in past admissions, the sparce times Ms. Spell was provided with an interpreter, it was secured only through VRI. Issues with the VRI malfunctioning are documented as were Ms. Spell's occasional refusal to use the VRI device because of ineffectiveness and the exacerbation of her condition. As in the past she was subjected to a myriad of different interpreters.

286.  After admitting Ms. Spell sixteen (16) times to the DLC, with essentially no change in its treatment plan, DLC decided then that instead of Ms. Spell needing a *different form of treatment*, she needed to stay longer.

287.  The plan was then to obtain a court order to stick her in a "short" term residential treatment center (SRT) or the State Hospital for up to one hundred and eighty (180) days.

288.    During DLC's efforts to find Ms. Spell placement, it documented the discriminatory responses of other DCF providers by noting  "discharge options including the state hospital or an SRT were complicated by the fact she requires an ASL interpreter at all times which is quite costly,"  "Placement into a program has been a challenge due to her hearing disability."

289.    Thus DLC is and has been aware that her treatment is affected by the refusal of other DCF contractors to agree to accommodate Ms. Spell's deafness. Ironically, it too has denied and continued to deny her interpreters and meaningful access.

290.    The records do not reflect any efforts to place Ms. Spell in a treatment center with practitioners who know ASL, or to find a treatment facility experienced in working with Deaf individuals and/or equipped to address the unique trauma experienced by a Deaf person.

291.    Ms. Joza  shared resources with DLC about Narcotics Anonymous meetings for Deaf people, where everyone uses ASL through Zoom, and how insurance may pay for Ms. Spell to obtain treatment at a facility better equipped for Ms. Spell. But those services were never provided to Ms. Spell.

292.    During this forty-five-day commitment Ms. Spell's record reflects her confirmed attendance at <u>one</u> group session but also inexplicably stated she is attending group sessions regularly.

293.    Ms. Spell reports there was much inactivity at DLC, and she sat at the facility, deprived of the ability to talk to anyone else in ASL. The staff documents that she reports feeling bored.

294.    The medical records indicate prolonged periods of crying and heavy sobbing. Ms. Spell becomes frustrated and continues to inquire why she cannot be released or treated elsewhere, and feels she is being penalized because she is Deaf.

295.    The facility still did not offer a videophone to allow her to contact family or friends.

296.   On September 7, 2023, Ms. Spell was discharged from the CSU and sent to the DLC Crossroads Program to a Res4 bed. A Res4 bed is believed to be a bed located in a highly structured residential center for addiction recovery, offering intensive treatment.

297.   She was sent to the DLC Crossroads Program, and DCF was informed of the discharge. There are no Deaf patients at Crossroads, nor practitioners who are fluent in ASL.

298.   On the first day of placement, at the DLC Crossroads Program, Ms. Spell was required to complete many forms on her own and attend very long group sessions (up to 3 hours each) without the benefit of an interpreter.

299.   Ms. Spell became frustrated and overwhelmed due to communication issues and left the program after just one day.

300.   Just two days after being discharged,  on September 9, 2023,  Ms. Spell went to Naples Hospital seeking help because she was hallucinating. Upon an evaluation without an interpreter, it was determined that she satisfied the threshold for the Baker Act, and the next day she was sent back to the DLC CSU for her 17th admission.

## Baker Act Ten - Committed by Baker Act to the David Lawrence Center September 10, 2023, to  November 8, 2023 - 59-day commitment.

301.   DCF was informed of the admission, and the DLC records indicate this was Ms. Spell's seventeenth (17th) admission to the DLC CSU.

302.   No interpreter was provided for her physical examination and Baker Act Psychological Evaluation wherein she is reported she has recently been raped.

303.   Ms. Spell immediately told DLC that "she left from Crossroads on Fri. that (sic) she was overwhelmed with the questions and the fact there were three-hour groups."

304.   Soon after admission Ms. Spell executed a contract with the DLC

outlining the services she shall receive.

305. This DLC treatment plan is essentially the same as the sixteen (16) plans used before this admission.

306. When interpreters were provided, it is only through VRI. VRI continued to expose Ms. Spell to a myriad of different interpreters prohibiting any continuity of interpreting services. Reports of the VRI not working, and VR interpreters not being available are well documented.

307. The records show Ms. Spell was offered a few group sessions during this very long commitment, but in lieu of an interpreter DLC offers her a whiteboard as an "accommodation." A whiteboard, by its nature cannot be an effective accommodation in a group setting unless the board is passed around to all the participants and they write down everything they are saying on the white board. Ms. Spell did not want to attend the groups unless she can be provided with an interpreter to fully participate.

308. A reoccurring theme in Ms. Spell's records is her desire to live and get well so that she can care for her daughters. But continual placement in facilities unequipped to treat Deaf patients was not working, and Ms. Spell's mental health was becoming worse.

309. When seeking another placement for Ms. Spell, the DLC CSU once again documented the discriminatory denials of other DCF contractors towards Deaf patients. DLC noted "Disposition to dual diagnosis (sic) Residential treatment center continues to be difficult **due to her ASL needs**." (emphasis added), it also reports there is a "program that *may* **consider and ASL interpreter** for her to step down from state." (emphasis added). DCF fails to offer a program who will treat Ms. Spell because she is Deaf, and she is perceived as too expensive.

310. On or around September 19, 2023, a remote court hearing was held in the Twentieth Judicial Circuit Court for an involuntary commitment of Ms. Spell. On information and belief an interpreter was provided for the state court hearing through VRI, but Ms. Spell had great difficulty understanding the proceedings and the

interpreter.  Ms. Spell was provided with an attorney but has difficulty conferring with the attorney, because the attorney appears remotely.

311.    According to the State Court Order, Dr. Maxim Chasanov, the Psychiatrist, testified at the hearing and recommended Ms. Spell be committed for 180 days and testified that Ms. Spell had <u>requested</u> to be sent to a state hospital.

312.    Ms. Spell is adamant that she did not request to go to a state hospital, because her treatment at the South Florida State Hospital was horrific. Ms. Spell requested to be sent to a facility equipped to treat Deaf people who use ASL, but no such testimony appears to have been presented to the court.

313.    The Court finds Ms. Spell competent but orders her committed for up to 180 more days. After she learned they are trying to send her back to a state hospital she becomes more of a management issue on the unit.

314.    Ms. Spell was struggling daily to help herself become well, but the lack of accommodations and inability to talk with other Deaf people, or those who knew sign language made the treatment too difficult.

315.    The medical staff noted several times in her record that she "voices frustration with not being able to communicate with peers and staff"  and that she is "bored" and "does not think anything is working for her," "she is feeling sad as she feels she is regressing as she faces return to state hospital treatment." Ms. Spell continues to decompensate.

316.    No other DCF mental health facility would accept Ms. Spell as a patient because she required ASL interpreters for treatment. DLC notes  "She clearly needs an SRT where she can be engaged to do the treatment she needs to move forward." But even after seventeen admissions to this CSU no efforts were made to obtain treatment for her in a center trained to work with Deaf patients or that provides language access.

317.    Throughout this long ordeal, Ms. Spell's mother had been trying to

advocate for her daughter, but the experts kept telling her there is no place for Ms. Spell. Ms. Spell's mother ask if her daughter can be sent to another state which has mental health services accessible to Deaf patients but is told that cannot be provided.

318. Once again, DLC still failed to offer a videophone to allow her to contact family or friends.

319. Ms. Spell languished at the CSU for more than two months, until November 8, 2023, when she was transferred to The Peace River Center (Peace River) in Bartow, Florida.

320. DCF was informed of the transfer.

## Baker Act Eleven - Committed by Baker Act to the Peace River Center November 8, 2023, to January 22, 2024 - 75-day commitment.

321. Peace River contracts with DCF to provide mental health services, and is designated as a Short-Term Residential Treatment Program (SRT). Like all the treatment centers before, there were no other Deaf patients, nor staff fluent in ASL at this facility.

322. Soon after admission Ms. Spell executed a contract with Peace River outlining the services she shall receive.

323. The treatment plan requires Ms. Spell to participate in treatment team meetings once per month, meet with a Behavioral Health therapist once per week, meet the psychiatrists and nurses daily for rounds and medical treatment, and attend six (6) groups per day.

324. Ms. Spell executed a number of DCF Interpreter Forms specifically stating she needed an ASL interpreter. The forms were signed by the Facility Administrator.

325. It appears Ms. Spell was provided with an *onsite* ASL interpreter, but not every day, nor are any interpreting services provided at night.

326.    Some of the interpreters Peace River used held no interpreting credentials of any kind.

327.    Ms. Spell tells the interpreter "she feels isolates and alone at the SRT and wanted to know why she was here and what the program was supposed to help her with."

328.    Interpreters were not provided for all the group sessions, which had as many as fifteen (15) participants.   Some of the group sessions involved showing movies, and on information and belief not all movies were captioned.

329.    Since Peace River is an inpatient program, Ms. Spell was to be afforded round-the-clock care. The medical records show she needed assistance at all hours of the day, but she was denied those services because when interpreters were provided, they generally left at 5.00 pm.

330.    By way of example, on November 9, 2023, at approximately 8.30 pm, Ms. Spell was reporting symptoms of a stroke. She was shaking and reporting paralysis and was "unable to write"—and there was no interpreter provided for this medical emergency with staff.

331.    Peace River also failed to offer a videophone to allow Ms. Spell to contact family or friends. However, upon occasion it allowed her to use her personal cell phone to Facetime her mother and her children. But that limits her calls, and does not allow her to call statutorily appointed advocacy agencies.

332.    The discharge plan was to send her to the Northeast Florida State Hospital. When Ms. Spell was told she is on the waiting list to be admitted to another Florida state hospital she becomes despondent, talks about missing her children and wanted to be placed in a less restrictive setting.

333.    On January 3, 2024, Ms. Spell was having seizures and was transported to the Winter Haven Hospital Emergency Department. On information and belief, she was not afforded interpreters for that treatment.

334.    On January 22, 2024, Ms. Spell was transported to the Northeast Florida

State Hospital in Macclenny, Florida. This facility is more than five (5) hours away from her mother and her children.

335.   DCF was informed of the transfer.

**Baker Act Twelve - Committed by Baker Act to the Northeast Florida State Hospital January 22, 2024, to February 4, 2025 - 379-day commitment.**

336.   Ms. Spell was transferred to the Northeast Florida State Hospital (NFSH) in Macclenny Florida, on January 22, 2024, and remained there until February 4, 2025.

337.   DCF directly operates this facility.

338.   Soon after her arrival she signed a contract with NFSH entitled "The Rights of Patients," along with other contracts which confirm the services she shall be entitled to while at the facility.

339.   From the records it appears Ms. Spell arrived at NFSH at approximately 9.00 am and was provided with an onsite ASL interpreter for only four (4) hours on the first day at NFSH. After the interpreter left, evaluations and exchanges of medical information occurred throughout the day.

340.   On the first day she executed a DCF Interpreter Form indicating she needs an ASL interpreter for her treatment. Her medical records are littered with affirmative requests for ASL interpreters and the fact that she is "Deaf."

341.   NFSH  notes on her intake form that her  "Preferred Language" is ASL. During her first nursing assessment on the date of admission, she told NFSH  "I'm deaf. I need an interpreter for classes and treatment team."

342.   NFSH created a Personal Safety Plan for Ms. Spell which identifies her triggers and calming strategies. Ms. Spell indicated a trigger for her is when  "No one is listening to  your [her] concerns" and a calming strategy is having the ability to "Call a friend or family member." But Ms. Spell was not provided with a videophone to make phone calls until many months later in violation of the statutes.

343.    On the first day, during her psychiatric evaluation, Ms. Spell, who did not want to go back to a state hospital, "stopped answering questions bowed her head down and started crying for about 5 minutes. She then said I want this to stop."

344.    Ms. Spell was trapped, with no way to extricate herself from these ongoing forced placements which were not designed for her as a Deaf person and only increased her sense of loneliness and despair.

345.    The nursing notes outlined how NFSH plans to deal with Ms. Spell's deafness. The "Registered nurse will assess individual's ability to hear within 24 hours of admission. If unable to hear, the RN will assess individual's ability to read lips or sign using ASL."  NFSH "will assure that an ASL translator is available for service planning meetings, as scheduled *if needed*." (emphasis added).

346.    Of the hundreds of pages of records received by Plaintiffs there are no records which reflect the personnel with the requisite skills, or the criteria used,  to determine "when" Ms. Spell needed an interpreter and when she does not. There are also no records showing she underwent a hearing evaluation.

347.    There are no records which reflect Ms. Spell was given an evaluation to gauge her lip-reading ability, nor the criteria or methodology used to determine under what circumstances Ms. Spell can effectively lipread. Yet NFSH relied on her lipreading "ability" in lieu of providing qualified interpreters.

348.     NFSH's medical records are littered with references to her Cochlear Implant (CI) being broken yet they have repeated entries stating Ms. Spell uses a CI to help her communicate. The device has been broken for years, well before her commitment to NFSH and continues to be broken today.

349.    In lieu of providing interpreters, NFSH also indicated that Ms. Spell will use a dry erase board to communicate. However, even if writing would have been effective, which it would not have been due to Ms. Spell's limited ability to read and write, the board was left at the nursing station.

350.    The Master Recovery Plan required Ms. Spell to attend four (4) groups

each weekday to include classes on Symptom Management, Substance Abuse, Emotional Coping and Anger Management. This translates into eighty (80) group sessions per month.

351.   Throughout her more than yearlong treatment, NFSH indicated it would only provide interpreters for the group sessions which take place from 9.00 - 11.00 am and 1.00 - 3.00 pm, for a total of four (4) hours per day. Interpreters were rarely provided at any other time, nor rarely during the weekends.

352.   Many of the onsite interpreters used by NFSH did not hold interpreting credentials, and Ms. Spell reported that some of the interpreters did not sign clearly, nor could they understand what Ms. Spell was signing.

353.   Immediately upon admittance Ms. Spell began to miss many group sessions, and reports the groups were not helping due to communication issues. As early as May 2024 staff members recommend Ms. Spell instead be provided with 1-on-1, or small group services believing those would suit her better because she kept leaving the large groups.

354.   The groups were to continue throughout her treatment until her discharge, but on August 15, 2024, NFSH discontinued her participation in groups indicating she was disruptive and talking loudly.  She was to be assigned to small groups when available.

355.   Ms. Spell was never assigned to a small group, instead she is provided with no group sessions from August to approximately October and then was forced back to the large groups that were not effective for her treatment. Even in December 2024, four months after the medical team agreed she will benefit from small groups, NFSH says there are still no small groups available for Ms. Spell to attend.

356.   NFSH denied interpreters for significant medical exchanges, while simultaneously administering psychotherapeutics, mood stabilizing and anti-psychotic medications. These exchanges include when she contracted COVID,

received treatment for many urinary tract infections, and other consequential medical issues.

357. Ms. Spell also often underwent a series of lab tests and EKGs to monitor the effects of the medications prescribed. Clinic notes show she reported to the clinic with a variety of issues to include anxiety, agitation and at times she was just yelling and screaming. But without an interpreter the staff could not redirect her or provide proper treatment.

358. On a monthly basis the nurses must perform a physical evaluation to include a review of her treatment goals and her compliance with those same goals. Many of these evaluations occur in the evening after interpreters had left and or on the weekends when no interpreters were provided.

359. NFSH would complete its monthly psychiatric rounds on the weekends or at other times when interpreters were not provided.

360. According to the DCF medical professionals, Ms. Spell must be committed to this most restrictive environment because she needs intensive round-the-clock care. Yet Ms. Spell was consistently denied care due to their failure to ensure effective communication and staff trained to work with Deaf patients.

361. The records also reflect many serious incidents occurring late at night wherein the staff was unable to redirect Ms. Spell, and she was not offered an interpreter during the exchange.

362. By way of example : On July 13, 2024, the staff was unable to redirect Ms. Spell and instead of using an interpreter to engage with her, they called security to assist. On the evening of July 30, 2024, the staff could not redirect Ms. Spell and called security and administered a Haldol shot to calm her down. NFSH attempted to communicate with her during this serious episodic incident with a dry erase board instead of an interpreter, but it was unsuccessful.

363. During the evening of August 14, 2024, Ms. Spell was banging on the

walls for more than 2.5 hours, but no interpreter is provided to talk with her, and the staff was unable to redirect her. With no interpreter present NFSH administered Haldol to calm her down, and when that did not work, they next administered Vistaril.

364. During the evening of August 28, 2024, staff was unable to redirect Ms. Spell when she became upset after medication administration. On August 31, 2024, Ms. Spell became anxious, and without an interpreter security was called to subdue Ms. Spell, and Haldol was administered to calm her down.  The failure to provide interpreters as needed resulted in medication administration or security being called many more times while Ms. Spell was at NFSH.

365. In April Ms. Joza contacted NFSH with her concerns about the lack of interpreters in the dorm or for any other event other than the group sessions, and reported Ms. Spell is becoming very isolated.

366. Ms. Joza  shared information about 12 step classes held by Zoom with and by other Deaf people and asks if NFSH can allow her daughter to attend those free meetings by Zoom. That request was denied.

367. The NFSH held treatment team meetings but only allowed fifteen (15) minutes for the meetings. Due to the time needed to engage through an ASL interpreter, or through paper and pen, at times the meetings abruptly ended, even though Ms. Spell was often not provided with an opportunity to explain how she was feeling or have her inquiries responded to. The request for more time was denied.

368. As a result Ms. Joza became very concerned with the lack of appropriate therapeutic activities to fill Ms. Spell's time while at the facility and became more vocal about Ms. Spell's need for a placement better suited for Deaf patients.  NFSH sees Ms. Joza's  efforts as a threat and documented they believed "the mother is not acting in her best interest."

369. In August 2024, Ms. Joza told the NFSH she thought it would be helpful to have an outside mental health evaluator who is fluent in ASL, and experience working with Deaf patients, evaluate her daughter. The evaluation would be

51

completed without any charge to NFSH. NFSH declined the request saying it is against their internal policies.[13]

370.    Ms. Spell was denied use of a telephone until approximately May to June of 2024. As she did at other facilities, prior to the installation of the videophone, Ms. Spell would attempt to call her mother on a *regular* phone, never knowing if the call went through.

371.    Without proper telephone accommodations the only way Ms. Spell could access a phone like interaction was through Microsoft Teams, but those calls could only be made when staff was available and required pre-planning.

372.    In approximately May to June of 2024, a videophone was installed but it was not placed in the dorm with the other patient phones, instead it's placed in an adjacent building. To use the videophone Ms. Spell had to be escorted to another building, which severely limited her phone access because it was dependent on staff availability.

373.    Ms. Joza complained that her daughter was unable to call her when needed nor allowed to place calls with the same frequency and time frame as the other patients.

374.    Finally in approximately October 2024 NFSH moved the videophone to

---

[13] Requests were made to the hospital to have Ms. Spell evaluated by Roger Williams, a Licensed Clinical Social Worker with more than 45 years' experience working in the mental health field with Deaf patients. No fee will be incurred by the hospital for the evaluation. Mr. Williams is fluent in ASL, has a Deaf family and as the Director of services  has been credited for establishing the mental health system for Deaf citizens in the state of South Carolina. NFSH administration refuses the request to allow Mr. Williams to evaluate Ms. Spell while at the facility and requires Mr. Williams become a licensed Florida provider if he wants to enter NFSH. Individuals from DCF, and to some degree the administrators at the NFSH are involved with the licensing process. On October 23, 2024, Roger Williams applies for the credentialing through DCF, a process which they state takes three to four weeks upon receipt of the documents. Mr. Williams does not obtain his credentials to enter NFSH until February 4, 2025- the exact same day Ms. Spell was discharged from the NFSH.

a closer location but still required staff to accompany Ms. Spell when she used the videophone. After the videophone was installed, it breaks down several times, and NFSH failed to offer Ms. Spell back-up phone access.

375.   To be discharged Ms. Spell had to take her medications, go to therapy, keep her room clean, comply with treatment, engage in appropriate behavior and decrease her aggression. The failure to provide meaningful access to services obstructed her ability to be cleared for discharge.

376.   When Ms. Spell was seen as violating the rules she faced many penalties to include ground restrictions, which made her feel even more isolated and alone.

377.   The records reflect she was involved in fights with other patients and "attacks" on staff but no mention of interpreting services being provided to deescalate the situation or effectively discuss what occurred.

378.   On May 12, 2024, Ms. Spell hit another patient, and lost ground privileges. She was not provided with an interpreter to tell her side of the story.  On Saturday, August 17, 2024, Ms. Spell was kicked by another patient and falls backward. There was no interpreter there to assist with communication.

379.   On August 29, 2024, Ms. Spell was involved in an altercation with another patient late at night. No interpreter was provided for the medical interaction or to process her feelings after the event.

380.   On December 11, 2024, Ms. Spell was punched and attacked after hours, and no interpreter was provided after the event when she sought medical treatment or to discuss what happened.

381.    After the December 2024 attack on Ms. Spell, Ms. Joza contacted NFSH and shared her ongoing concern with her daughter being unable to communicate after these assaults, and the ongoing communication barriers her daughter was experiencing. The hospital agreed it will "revisit" its position on the number of times an interpreter shall be provided—but they never do.

382.   In April of 2024, Ms. Spell and her mother requested interpreting

services so that Ms. Spell could attend church services. NFSH denied that request and instead offered to *investigate* the possibility of projecting the words of some of the religious services onto the wall for Ms. Spell to read. This did not provide Ms. Spell with meaningful access to religious services.

383.   Ms. Spell and her mother renewed their requests for interpreting services for religious services again in November, December and January- all requests were denied.

384.   Ms. Spell was finally placed on discharge status on October 1, 2024, however, NFSH reported it could not find a suitable place for Ms. Spell but provided no notes of where they tried placement.  In the hundreds of pages of records, there is not one note showing any effort to obtain treatment in a facility designed or trained to work with Deaf people.

385.   In November Ms. Joza continued to share her serious concerns for Ms. Spell's continued placement at the hospital when such a restrictive setting is not needed.

386.   In November NFSH became more annoyed with Ms. Joza's advocacy efforts for her daughter. NFSH documented its' plan to petition the Court to have Ms. Joza removed as the guardian. But because the docket is closed for December their plans are foiled, and they plan to have her removed in January 2025.

387.   It is unclear why DCF is still holding her in the restrictive setting of a state hospital after she was cleared for discharge. She was not attending any classes, and was only receiving medication management, which is a service she can receive outside of a locked-down state hospital.

388.    DCF changed her discharge release date to December 15, 2024, but she was still not discharged.

389.   In January 2025, the NFSH  discharge coordinator stated placement was hard due to funding, and her needs as a Deaf patient.

390.   On February 4, 2025, DCF finally discharged Ms. Spell and she was

sent to an Assisted Living facility which offers housing, with the mental health services being offered through outpatient services. On the same day Roger Williams, MSW was approved to enter NFSH to evaluate Ms. Spell. This was after DCF was repeatedly made aware of the ADA violations.

**February 4, 2025 – March 7, 2025 - Ms. Spell received services from Magnolia Assisted Living Facility.**

391.   Upon discharge Ms. Spell was sent to the Magnolia Assisted Living Facility (Magnolia) in Highland County.  Magnolia is a contractor of DCF, and DCF was informed of the placement.

392.   Soon after admission, Ms. Spell executed a contract with Magnolia outlining the services she shall receive. Magnolia was required to provide Ms. Spell with housing, medication administration, psychiatric oversight and assistance with other daily living skills when needed.

393.   While Ms. Spell was at Magnolia her mother visited her, and called or texted her almost every day to advocate for her needs. Ms. Joza must remain vigilant because she has a Deaf daughter, and unlike parents with children who can hear she must intercede on her daughter's behalf due to the unending violations of the anti-discrimination statutes by DCF providers.

394.   Ms. Spell and her mother requested ASL interpreters, but interpreters were never provided for any interaction. Magnolia expressed its frustration with Ms. Spell's and her mother's ongoing requests for ASL interpreters.

395.   Magnolia failed to provide a videophone for Ms. Spell to make phone calls.

396.   Ms. Spell met with a psychiatrist through Magnolia, but the psychiatrist refused to provide an interpreter and forced Ms. Spell to write on paper to communicate.

397.   Due to the lack of interpreters Ms. Spell and the staff at Magnolia had

55

great difficulty communicating, which created unnecessary friction. They also continually reminded her that she speaks too loudly, but Ms. Spell explained to them that is not something she can control.

398.    In their records, Magnolia admitted Ms. Spell  had never assaulted or harmed another client while at the facility, but only six (6) days after Ms. Spell was placed at Magnolia, on February 10, 2025,  Magnolia served her with a notice that she had to leave the next month.

399.    On March 7, 2025, a conversation ensued between Ms. Spell and Alex Dygdon, the Facility Administrator, about payment for her room through her Social Security check. The lack of an interpreter made the situation unnecessarily escalate simply because Ms. Spell was asking Mr. Dygdon to repeat what he said  because she could not understand.  No one was hurt nor was there any physical engagement, they argued because the two of them could not understand each other.

400.    Law enforcement was called,  and Ms. Spell was taken to Peace River to be evaluated. Interpreters were not provided for the interaction with law enforcement.

**Baker Act Thirteen - Committed by Baker Act to Peace River March 7, 2025, to March 11, 2025 - 4-day commitment.**

401.    Ms. Spell arrived at Peace River, now for the second time, and she executed a DCF Interpreting Form requesting interpreters,  but they were not provided until the next day.

402.    Ms. Spell underwent the intake process, which included a psychiatric evaluation without the assistance of an interpreter. Ms. Spell tried to explain she just got into a verbal fight with "Alex" at Magnolia and did nothing wrong and as a result she was taken to Peace River.

403.    She refused to sign some of the documents because she believes she was

stuck at Peace River because of the communication breakdown between her and "Alex." Peace River improperly saw this as defiance, and Ms. Spell was involuntarily committed. DCF was informed of the admission.

404. On the same day Ms. Spell was brought to Peace River,  Ms. Spell's mother calls Peace River after she learns of Ms. Spell's commitment, and shared concerns about her daughter being Deaf and needing interpreters.

405. On-site interpreters were provided for a portion of the days she was at Peace River, but some had no interpreting credentials and were hard for Ms. Spell to understand.

406. Once provided an interpreter, Ms. Spell shared her concern about her placement at Magnolia, as it is not "deaf friendly" thus her needs were not being met as she was without interpreters.

407. Ms. Spell also reported her efforts to try to reunite with people in the Deaf community has been hard.  She reported how she is often misunderstood because of the lack of interpreters and how she is unable to "bridge the gap with communication."

408. Ms. Spell explained how her "culture," which is Deaf Culture,  affects her access to mental health treatment.

409. Peace River memorialized her need to be "more involved with the deaf community to be more social and around peers who understand her life barriers" and that "the client can read lips but this can only get her so far with communication with others."

410. Ms. Spell reported how she wants to be with her children and her dream of becoming a therapist for other Deaf people. She described how her journey to wellness has been so difficult for her because she cannot access the services she needs because she is Deaf.

411.  On March 11, 2025, Ms. Spell was cleared for discharge, but Magnolia refused to allow Ms. Spell to return, so alternative housing must be secured. DCF was notified of the discharge.

**Approximately March 11, 2025 - April 20, 2025,  Ms. Spell received services in the community from the DLC FACT Team.**

412.   On approximately March 11, 2025, Ms. Spell began again to receive services from the FACT team.

413.    The services offered by the FACT team have not changed.

414.   With no other housing options available to Ms. Spell, she was sent to Talbot House Ministries, a homeless shelter in Lakeland, Florida.

415.   Upon arrival at Talbot House,  she was not provided with an interpreter to explain the rules of her placement. Soon after she violated a rule about food consumption and was thrown out of the homeless shelter.

416.   As it has done in the past, DLC provided interpreters upon occasion but only through VRI. The records reflect transmission failures with the device  rendering it unavailable, unqualified interpreters, and at times the unavailability of VR interpreters.

417.   The DLC FACT team still failed to provide interpreters for any  of the services it provided at her home.

418.   The FACT team noted that Ms. Spell's language needs, and her isolation from the Deaf Community are barriers to her achieving her goals, but no efforts were made to secure her appropriate services for Deaf people or provide effective accommodations.

419.    Ms. Spell soon became eligible to attend the groups offered by FACT and wanted to attend the substance abuse groups held two days per week.  Ms. Spell and her mother again renewed the request for *onsite* interpreters due to the long-standing issues with VRI.

420.   The statutes are clear that securing the ASL interpreters is the FACT

team's responsibility, but even with all the technical and therapeutic issues with VRI the FACT team still refused to secure onsite interpreters for the group sessions and stated it would only provide VRI interpreters.

421.    To ensure effective ASL interpreters were provided, and to avoid all the past documented and ongoing issues with VRI, Ms. Joza's personally pursued having Ms. Spell's insurance carrier, Sunshine Health, provide and pay for some *on-site* ASL interpreters for FACT services.

422.    Ms. Joza, due to her association with a disabled person, must undertake this effort because her daughter is Deaf, and her needs were not being met. Ms. Joza's effort to coordinate on-site interpreting services through Sunshine Health became a burdensome nightmare.

423.    Ms. Spell began to report feeling lonely and despondent again with no way out of the revolving door of treatment centers. She was also tired of all the fighting she and her mother must do to try to get her interpreters and other access.

424.    On April 20, 2025, Ms. Spell approached a Collier County Sheriff's Office patrol vehicle and sought help. Ms. Spell was taken to Physicians Regional Health Care in Naples for evaluation. No interpreter was provided for the exchange with law enforcement.

425.    On information and belief no interpreter was provided at Physicians Regional Health Care. Ms. Spell was then transferred to Lakeland Regional Medical Center and Baker Acted again.

### Baker Act Fourteen - Committed by Baker Acted to Lakeland Regional Medical Center April 20, 2025 to April 23, 2025- 3-day commitment.

426.    Lakeland Regional Medical Center (Lakeland RMC) is a contractor of DCF to provide mental health services, and when admitted DCF was informed of the admission.

427. Soon after admission, Ms. Spell executed a contract with Lakeland RMC memorializing the services it would provide.

428. The treatment plan includes participation in the therapeutic milieu, group therapy, written assignments from social work, as well some limited supportive therapy from the psychiatrist and social worker.

429. As Ms. Spell has done during almost every commitment to date, she provided authorization for her mother to be provided access to her health care information.

430. Ms. Spell arrived in the evening and immediately requested an interpreter, and the next morning her mother spoke to staff and specifically requested an onsite interpreter. The records indicate that the "team lead" was notified of the requests. Ms. Spell later made a written request again for interpreters. Even with the ongoing requests Lakeland RMC did not provide interpreting services throughout the duration of her treatment.

431. During the April 21, 2025, psychiatric examination the doctor notes "Patient is deaf and the entirety of today's communication was done by pen and paper." On April 22, 2025, the physician again indicates "Communication again was completed through paper and pencil as the patient is deaf."

432. Even though on sparce occasions a VRI interpreter may have been provided the records reflect many significant medical exchanges occurred without interpreters. Also, there are several notes in the record showing the staff was "unable to get the language line to work."

433. The absence of interpreters results in conflicting information being recorded in her medical records about Ms. Spell's background, the events which led her to Lakeland RMC and her mental health history.

434. Lakeland RMC offered no videophone to allow telephone access.

435. When discharged from Lakeland RMC, DCF was notified.

**April 23, 2025 - May 16, 2025, Ms. Spell received services in the community from the DLC FACT Team.**

436.   Upon release Ms. Spell began to receive services from the DLC FACT team. She was moved to a house in Fort Myers and eventually living with other residents who are not Deaf or know ASL.

437.   Because Ms. Spell must attend group sessions twice per week and medication management meetings, her mother continued to try to coordinate *on-site* interpreting services through Ms. Spells's insurance provider. At times Ms. Joza was successful, other times she was not, as Ms. Joza tries to take on this task while working her full-time job and raising two of Ms. Spell's daughters. She continued to spend significant time advising DCF contractors of their obligations under the ADA. This caused Ms. Joza to lose the opportunity to just support her child. A task that a parent with a hearing child would not be required to perform.

438.   When Ms. Joza was unable to secure the onsite interpreters, FACT forced Ms. Spell to use VRI and still failed to provide any interpreter for the home visits--which are mandatory.

439.   On or around May 13, 2025, a FACT team member came to Ms. Spell's apartment for a compliance check. Ms. Spell was reported to be agitated and yelling. The FACT employee called 911 and a Lee County Police Officer responded to the home to evaluate Ms. Spell for a Baker Act admission.

440.   No interpreter was provided for the exchange with law enforcement or the FACT team member.

441.   Ms. Spell was taken to the Naples FACT office for further evaluation. She was evaluated through VRI. Miraculously she did not meet the threshold for a Baker Act admission and was released.

442.   On May 16, 2025, Ms. Spell was reported to be highly agitated, and underwent a Baker Act screening through a VRI interpreter at the FACT office.

443.    Ms. Spell became very agitated by having to use the unqualified VR interpreter, instead of being provided with an onsite interpreter, to explain how she was feeling. Her agitation with the VR interpreter was noted in the records, and her agitation was part of the basis to have her Baker Acted again.

444.    Ms. Spell was involuntarily Baker Acted to the DLC CSU again.

**Baker Act Fifteen - Committed by Baker Act to the David Lawrence Center CSU May 16, 2025, to  May 19, 2025 - 3-day commitment.**

445.    DCF was informed of the admission, and the DLC records indicated this was Ms. Spell's eighteenth (18th) admission to the DLC CSU.

446.    Ms. Spell requested an onsite interpreter, but refused to execute the DCF Interpreter Form, because the only interpreter DLC would provide was a VR interpreter which does not allow her to communicate effectively.

447.    Soon after admission Ms. Spell executed a contract with the DLC outlining the services she shall receive.

448.    Ms. Joza immediately had to engage in her advocacy role and spoke to the CSU and emphasized the importance of Ms. Spell being accommodated with *onsite* interpreters and the need for phone access. The same advocacy she had been engaging in with DLC for years which not only affected Ms. Spell's rights, but her rights as a mother to be able to receive phone calls from her daughter and to be able to just be a mother and support her daughter in her times of need.

449.    Even though a year and a half had passed since Ms. Spell's last admission to this CSU, and she has continued to be a DLC FACT patient, the DLC still failed to offer a videophone for Ms. Spell to access a phone as required by the statutes.

450.    The Treatment Plan for this admission was similar to the last seventeen (17) used with Ms. Spell.  Ms. Spell must participate in group sessions, daily medication management meetings, and physical examinations. Many of the services were provided without the benefit of an interpreter.

451.   As Ms. Spell was prepared for discharge, a safety plan was drafted once again, without the provision of an interpreter.

452.   Ms. Spell was discharged from the DLC on May 19, 2025, and DCF was informed of her discharge.

**May 19, 2025 – June 17, 2025, Ms. Spell received services in the community from the  DLC FACT Team.**

453.   Ms. Spell returned to her apartment in Fort Myers and continued to receive services from the DLC FACT team.

454.   The FACT team now provided her medication through pre-packaged boxes on a weekly basis and checked her compliance once per week at her home. These visits are interactive exchanges of medical information required to gauge her mental health status and address problems or side effects from the medication.

455.   Interpreters were never provided for the interactions, nor the mental health treatment provided by FACT at Ms. Spell's home. She was placed in a home where no one knew ASL.

456.   Ms. Spell's mother continued to advocate for her daughter and continues to be forced to act as a proxy ADA Coordinator for the FACT team who refused to secure onsite interpreters for the mandatory group sessions and therapy.

457.   On approximately June 17, 2025, Ms. Spell began to decompensate, and it's unknown if she had been taking all her prepackaged medication. She was taken to Park Royal Hospital for an evaluation.

**Baker Act Sixteen - Committed by Baker Act to Park Royal Hospital  June 17, 2025, to June 24, 2025 - 7-day commitment.**

458.   On June 17, 2025, Ms. Spell was admitted by Baker Act to Park Royal Hospital again. This was her second commitment to Park Royal since approximately 2023.

459. DCF was informed of the admission, and soon after admission Ms. Spell executed a contract with Park Royal outlining the services she would receive.

460. Interpreters were sporadically provided, and when provided they were only provided through VRI. Park Royal documented the ineffectiveness of the VRI by noting "Difficult to obtain history through the interpreter," "Required two interpreters as first one was unable to obtain adequate information." It also noted how Ms. Spell's "deafness complicates her medical issues."

461. Even when noting Ms. Spell was anxious and having episodic symptoms, Park Royal refused to provide an interpreter and instead forced Ms. Spell to use a cell phone to text with staff or write on paper.

462. The Treatment Plan required Park Royal to provide daily psychoeducational and process group therapy sessions, daily recreational therapy groups to practicing coping mechanisms, and required a Physician/Practitioner to monitor medications for efficacy and conduct daily rounds.

463. The records indicated Ms. Spell attended some group sessions but makes no mention if interpreters were provided.

464. The records reflect that she was responding to internal stimuli in ASL, but because the DCF provider does not know ASL they could not analyze what she was saying to properly evaluate her status.

465. Park Royal still failed to offer a videophone at the facility.

466. On June 24, 2025, Ms. Spell was discharged from Park Royal Hospital and DCF was informed of the discharge.

**June 24, 2025 – July 12, 2025, Ms. Spell received services in the community from the DLC FACT Team.**

467. When released from Park Royal she received services from the DLC FACT team again.

468. The FACT team provided the same services as in the past, and when

interpreters are provided it was only through VRI. As in the past, when the FACT team came to Ms. Spell's house for medication management it did not provide interpreters.

469.    Ms. Joza was once again forced to advocate and try to secure onsite interpreters as the FACT team's proxy ADA coordinator, instead of just providing maternal support for her daughter.

470.    Ms. Spell decompensated and is brought to Park Royal to be evaluated, and Baker Acted again.

**Baker Act Seventeen - Committed by Baker Act to Park Royal Hospital  July 12, 2025,to  July 18, 2025- six-day commitment.**

471.    On July 12, 2025, Ms. Spell was Baker Acted to Park Royal Hospital for the *third* time, and DCF was informed of the admittance.

472.    Soon after admission Ms. Spell executed a contract with Park Royal memorializing the services she would receive.

473.     The treatment plan on this commitment was essentially the same as the prior admissions, and Park Royal noted Ms. Spell had undergone inpatient treatment multiple times there.

474.    As in the past, when interpreters were provided it is only through VRI, and provided sparingly. Although Ms. Spell requested onsite interpreters due to her mental health needs, upon admission Park Royal used VRI again, and in protest Ms. Spell shoved the machine away, upset that the interpreters could not understand her.

475.    Like the other facilities Ms. Spell had been committed to, during this commitment she had to interact with many different health professionals, which change daily.

476.    It is unclear from the records whether interpreters were provided for the group sessions, because the medical records do not reflect what sessions Ms. Spell was alleged to have attended.

477.    Ms. Spell also received care for medical ailments while there, but interpreters were not provided for all of those medical evaluations and exchanges.

478.    Park Royal petitioned the Court for a longer involuntary placement and a hearing date is set. The state court Notice provided the Rule 2.540 ADA promulgation indicating if an individual needs an ADA accommodation to attend the hearing, the ADA Coordinator at the state courthouse can be called. But Park Royal still failed to provide a video phone for Ms. Spell to place and receive phone calls.

479.    On July 18, 2025, Ms. Spell was discharged from Park Royal Hospital and DCF was informed of the discharge.

**July 18, 2025, – August 6, 2025, Ms. Spell received services in the community from the DLC FACT Team.**

480.    On July 18, 2025, Ms. Spell began to receive services again from the DLC FACT team. She was once again housed with no other Deaf people, nor individuals who knew ASL.

481.    In the morning of July 22, 2025, Ms. Spell was sleeping and awoke to find the landlord in her room going through her personal belongings. Because Ms. Spell cannot hear people come into her room, she did not know how long the landlord had been rifling through her things. The landlord took Ms. Spell's medication and began taunting her and yelling, but Ms. Spell could not understand everything that was being said.

482.    An argument ensued, and the landlord called 911, and two officers from the Fort Myers Police Department responded. The police officers *only* interviewed the landlord, and another person in the house who could hear and speak, and did not talk to Ms. Spell, nor was an interpreter provided for the exchange.

483.    Ms. Spell was arrested for battery and transported to the Lee County Jail where she was processed without the assistance of an interpreter. This is believed to be the first time Ms. Spell has ever been arrested.

484.     Due to the arrest, she was unable to return to her home, and her mother assisted in finding her a hotel. Ms. Spell felt hopeless because she was not provided with an interpreter to tell the officers her side of the story and was now homeless.

485.     On approximately July 24, 2025, Ms. Spell was to be transferred from the Collier County FACT team to the Lee County FACT team, and an appointment was scheduled for the interview. But because the Lee County FACT team would not commit to secure an ASL interpreter for the interview, Ms. Joza must again act as her daughter's advocate and secure the interpreter through Ms. Spell's insurance company. After all Ms. Joza's efforts to secure an interpreter, the meeting is canceled.

486.     On approximately July 31, 2025, housing was found for Ms. Spell at The Serenity Recovery Living (Serenity House) facility, a Sober House in Cape Coral, Florida, and she was to move in on August 1, 2025.  In this facility, like others before, she was required to pay part of her rent. Ms. Spell will be the only Deaf resident at the house.

487.     Serenity Housing had a long list of rules and requirements for the residents to follow, but an interpreter was not provided to explain the rules to Ms. Spell.

488.     Late at night on August 2, 2025, it appears Ms. Spell was accused of breaking a rule which she did not know, relating to the consumption of food. Without an interpreter present,  and as other residents watched, the house manager attempted to explain the rules about the consumption of food from the refrigerator. The house manager became aggravated.

489.     Ms. Spell became upset because she could not understand what was being said and she removed herself and went back to her room.  The house manager then followed her into her room to continue the argument, with four other women watching. Ms. Spell  felt ganged up by the accusations and the number of people in the room. Ms. Spell began to yell at the house manager and felt she needed to defend herself and became physical with the house manager.

490.   The Cape Coral Police Department was called, and Ms. Spell was "interviewed" without an interpreter present. Ms. Spell was arrested early in the morning on August 3, 2025, and processed at the Lee County Jail without the provision of an interpreter and later released.

491.   On August 4, 2025, Ms. Joza sent an email message to the management of Serenity House and the DLC FACT team asking for a copy of the house rules and offered to interpret the rules to Ms. Spell, since they refused to provide an interpreter. No response was provided.

492.   After she returned to Serenity House, she is repeatedly being told by the ill-trained staff she was talking too loudly. Because Ms. Spell is Deaf, she cannot hear the full volume of her voice, and these insults, based on her disability, made her feel unwelcome and she left the facility.

493.   Ms. Spell was now homeless. When out on the streets she decompensated and was brought by the Cape Coral Police Department to SalusCare in Fort Myers for an evaluation. No interpreter was provided for the exchange with law enforcement.

## Baker Act Eighteen - Committed by Baker Act to SalusCare August 5, 2025, to August 8, 2025 - 3 day commitment.

494.   On August 5, 2025, Ms. Spell was involuntarily admitted to SalusCare, in Fort Myers and DCF was informed of the admission.

495.   SalusCare is a Crisis Stabilization Unit (CSU), and a contractor of DCF.

496.   Soon after admission Ms. Spell executed a contract with SalusCare outlining the services she would receive. She also executed a number of consent forms and other legal documents without the provision of an interpreter.

497.   Curiously, unlike the hundreds of other DCF Interpreter Forms in Ms. Spell's records, this record contained an unsigned DCF Interpreter Form, indicating Ms. Spell did *not* want an ASL interpreter.

498.    The medical records are filled with references indicating her primary language is "sign language," and that she is "deaf and speak (sic) with difficulty."

499.    Throughout the treatment SalusCare denied interpreters and required Ms. Spell to write on paper to communicate. Interpreters were not provided for any treatment to include attendance in the group sessions. Examples of the inability to communicate are noted in her records, to include the inability to administer a breathalyzer test because Ms. Spell was "unable to understand directions on how to use (sic)."

500.    The treatment plan included attendance of groups sessions but interpreters were not provided for the sessions. Nor are there documented group therapy notations showing how or if she participated in group therapy.

501.     Ms. Spell reported that part of her problem is that she is "not being heard at the group home [Serenity] and there is little support available at the group home."

502.    During the commitment it is reported many times in her records that she is responding to "internal stimuli" in ASL, but because the staff does not know ASL no one knows what Ms. Spell is saying.

503.    During this admission Ms. Joza contacted SalusCare requesting interpreters for her daughter and made an affirmative request to speak to Ms. Spell by phone. SalusCare reported that Ms. Spell prefers to communicate in "writing" and that they offer no phone service to Deaf patients.

504.    On August 8, 2025, she was discharged and DCF was notified.

**August 8, 2025 - August 12, 2025- Ms. Spell received services in the community from the DLC FACT Team.**

505.     On approximately August 8, 2025, Ms. Spell began receiving services from the DLC FACT team again and completes the DCF Interpreter Forms specifically stating she needs ASL interpreters.

506.    Interpreters were only provided through VRI using the small iPad, and

the same issues with VRI efficacy and operability continue.

507.   Apparently unknown by Ms. Spell and her mother, it appeared Ms. Spell had violated the terms of her pretrial release, and a bench warrant is issued for her arrest on August 11, 2025.

508.   Now that Ms. Spell has been moved to Fort Myers,  the plans are to transfer her to the Lee County FACT Team and on approximately August 12, 2025, she began to receive FACT services under Centerstone.

## August 12, 2025 - August  25, 2025- Ms. Spell received services in the community from the Centerstone FACT Team.

509.   Centerstone is a DCF contractor which provides the same type of services that the Collier County DLC FACT team provides. Interpreters were not being provided by Centerstone except when Ms. Joza secured the interpreters.

510.   Ms. Spell was arrested on August 17, 2025, on the warrant, and no interpreter was provided for the exchange with law enforcement during the arrest or processing. She was released from custody and sent to a homeless shelter,  but she soon left the shelter and no one was able to locate Ms. Spell for a few days. Ms. Spell is without her medication.

511.    Ms. Spell eventually meets up with her mother, but she is very aggressive, and she was brought to the closest receiving center for an evaluation.

## Baker Act Nineteen - Committed by Baker Act to the DLC CSU approximately August 25, 2025, to  August 28, 2025- 3-day commitment.

512.   Ms. Spell was admitted to the DLC CSU for her nineteenth (19th) admission to this CSU. DCF was informed of the admission.

513.   Soon after admission Ms. Spell executed a contract with the DLC outlining the services she shall receive.

514.   DLC used essentially the same treatment plan as before and notes in the

plan they shall " Engage ASL interpreter for all key clinical interactions." The records reflect she likely received VRI interpreting services (no onsite services noted) for less than four (4) hours during her three-day commitment.

515.   The DLC still failed to offer a videophone for Ms. Spell to have equitable access to the telephone.

516.   On August 28, 2025, she was discharged without the benefit of an interpreter and DCF was informed of the discharge.

**August 28, 2025 – September 8, 2025, Ms. Spell received services in the community from the Centerstone FACT Team.**

517.   When released from the DLC CSU, she was to receive services from the Centerstone FACT team, but because the Centerstone FACT team refused to provide interpreters, Ms. Joza begins coordinating onsite interpreting services.

518.   Centerstone brings Ms. Spell to new housing, to meet the new landlord and sign a lease, but no interpreter is provided for the exchange.

519.   Centerstone is administering medication and required to check on Ms. Spell's mental health status but fails to provide interpreters.

520.   Ms. Spell goes missing for a few days without her medication, and law enforcement was called to file a missing person's report. Ms. Spell was eventually located and when found Centerstone required Ms. Spell to execute several legal documents for the Area Agency on Aging without the provision of an interpreter.

521.   On September 7, 2025, during a home visit, with her mother present but without interpreters, the License Mental Health Counselor (LMHC) notes in the records that "client seems very uncomfortable in the world of the hearing, asked [her mother] if she ever had been in an all-deaf supportive environment with deaf people." Ms. Joza requests that Ms. Spell be sent somewhere to get the treatment needed in a facility trained to work with Deaf people. When Centerstone is asked who is

responsible for securing those services for Ms. Spell, the Counselor indicates it will be discussed with the team. But no changes are made to her services and Ms. Spell is never sent to a provider that is trained and equipped to provide mental health service to Deaf people.

522.   On September 8, 2025, an unknown person saw Ms. Spell in poor condition and calls 911. Ms. Spell was first taken to the emergency room then transferred to Park Royal Hospital for evaluation by law enforcement. No interpreter was provided for the exchange with law enforcement.

**Baker Act Twenty - Committed by Baker Acted to Park Royal Hospital September 8, 2025 to  September 16, 2025- eight-day commitment.**

523.   Ms. Spell was admitted to Park Royal for the fourth time, and DCF was informed of the admission.

524.   Soon after admission Ms. Spell executed a contract with Park Royal outlining the services she shall receive. Like before she was provided with interpreters upon occasion but only through VRI.

525.   During this commitment, like the ones before she had to interact with many different health professionals, which change daily.

526.   The treatment plan was essentially the same plan used in the prior admissions, which included attendance at group sessions. But Park Royal noted she was not really participating in the groups and isolates herself.

527.   Park Royal still failed to provide a videophone for Ms. Spell to  access a telephone.

528.   She was discharged on September 16, 2025, and picked up by the FACT team, there is no record of an interpreter being provided for the discharge.

529.   DCF was informed of the discharge.

**September 16, 2025, – September 22, 2025, Ms. Spell received services in the community from the Centerstone FACT Team.**

530.    When released from Park Royal Ms. Spell was immediately taken by Centerstone to be evaluated by Centerstone's psychiatrist and provided injections. Centerstone did not provide an interpreter for the psychiatric session or the medical exchange.

531.    Centerstone continues to provide services in Ms. Spell's home to include medication administration and mental health checkups without the provision of an interpreter. In lieu of interpreters the staff texts with Ms. Spell but notes in the records they have a hard time understanding her, and she gets "agitated" and "signs rapidly."

532.    The records reflect the staff often knocks on the door to Ms. Spell's home then complains when she, the Deaf client, cannot hear the knock. They acknowledge her need for a special doorbell device yet fail to install it for Ms. Spell's safety.

533.    While denying interpreters, and refusing to provide staff fluent in ASL, Centerstone instead charged a fee to Ms. Spell (and or the taxpayers) for one staff person to watch ASL videos so to practice "sign language."

534.    On approximately September  22, 2025, Ms. Spell was picked up by the Fort Myers Police Department for allegedly trying to cut herself and transported to SalusCare. No interpreter was provided for the interaction with law enforcement.

**Baker Act Twenty-One - Committed by Baker Act to SalusCare in Fort Myers September 22, 2025, - September 26, 2025 – four-day commitment.**

535.    On September 22, 2025, Ms. Spell was admitted by Baker Act for the *second* time to SalusCare, and DCF was informed of the admission.

536.    Soon after admission Ms. Spell executed a contract with SalusCare memorializing the services she would receive.

537.    Ms. Spell underwent many examinations, medication management

sessions, psychiatric rounds, with many different staff members each day without the benefit of an interpreter. She executed forms consenting to a waiver of a broad array of her rights to include searches, seizure, breath scanning, being photographed etc. without the assistance of an interpreter.

538.   Like all the prior commitments, she was still being administered psychotropic medications.

539.   SalusCare indicates Ms. Spell was participating in groups, but fails to provide interpreters, nor provide notation of the sessions she was alleged to have attended or how she participated in the groups.

540.    As in past admissions she provides authorization for her mother to have access her medical treatment and to visit her at the facility.

541.   Approximately two days after Ms. Spell was admitted she is presented with the DCF Interpreter Form about the availability of interpreters.  Curiously again she selected *not* to be provided with an interpreter.

542.   During the commitment it is reported many times in her records she is responding to internal stimuli in ASL. But because the staff does not know ASL no one knew what she was saying.

543.   Ms. Joza called SalusCare again to advocate for her daughter to be provided with interpreters and to inquire about the mental health services she was being offered.

544.   Although Ms. Spell had been asking to call her mother since she was admitted, it isn't until September 25th, that the physician entered an order allowing her to use FaceTime to call her mother. Although already told by Ms. Joza they are required to have a videophone SalusCare still failed to comply.

545.   Ms. Spell was discharged on September 26, 2025, a Friday, and due to communication issues she was discharged without her medications. DCF was informed of the discharge.

**September 26, 2025, – September 28, 2025, Ms. Spell received services in the community from the Centerstone  FACT Team.**

546.    When released from SalusCare she  received  services from the Centerstone FACT team, but she will not be seen by the FACT team until Monday.

547.    Ms. Spell was without her medication and on September 27, 2025, Ms. Spell left her home, and no one knew where she was located. Ms. Joza, who speaks to her daughter almost every single day, prepares to file a missing person's report.

548.    On September 28, 2025, the Fort Myers Police Department finds Ms. Spell pacing around, allegedly speaking to herself, and she told the police she was hearing voices. She was taken by law enforcement to SalusCare to be Baker Acted again. No interpreters were provided for the exchange with law enforcement.

**Baker Act Twenty Two - Committed by Baker Act to SalusCare, September 28, 2025, to September 30, 2025- 2-day commitment.**

549.    Ms. Spell was admitted to SalusCare  for the third time, just two days after she was released. DCF was informed of the admission.

550.    Soon after admission Ms. Spell executed a contract with SalusCare outlining the services she shall receive.

551.    She was required to sign a document which included a series of consents to waive many of her rights and was still being administered psychotropic medication.

552.    Ms. Spell was still being denied ASL interpreters. As in the past admissions, she had to attempt medical exchanges with many staff members and engage to some degree with other patients.

553.    Ms. Spell reported  that calming strategies for her include being able to able to "talk to staff," "talk with peers on the unit," and "call a friend or family member." But without interpreters these calming strategies cannot be employed, and SalusCare still failed to offer a videophone to place calls to her family.

554.     Upon her admission, she again granted permission for her mother to

75

have access to her medical records and to visit her while at the facility. Ms. Joza is not called by staff until September 29, 2025, and informed of the commitment.

555.   Ms. Joza was furious that Ms. Spell was unable to call her directly through a videophone to tell her mother she was committed as her mother was in the process of filing a missing person's report. Ms. Joza reminded SalusCare that she spoke with them during her daughter's last admission and told them of her need for an ASL interpreter and phone access. She further explained that SalusCare discharged her daughter without her needed medication, likely because they could not communicate with her.

556.   Ms. Joza told the Clinical Nursing Director (CLN) she wanted to speak to the risk manager because her daughter had a right to an ASL interpreter.  The notes reflect the CLN spoke to Brian Bakalar, the Director of Acute Care, about the need for ASL interpreters.

557.   On September 29, 2025,  Brian Bakalar was also contacted by Plaintiffs' counsel, who left a message advising of their obligation to secure interpreters for Ms. Spell.

558.   The next day Ms. Spell  received more treatment and then was discharged without the benefit of an interpreter. DCF was informed of the discharge.

**September 30, 2025 – October 11, 2025, Ms. Spell received services in the community from the Centerstone FACT Team.**

559.   When released from SalusCare she continued to receive services from the Centerstone FACT Team. Interpreters are still not being provided for the daily in-home services. Records reflect on some home visits Ms. Spell is responding to internal stimuli in ASL, but none of the staff know what she is saying to assist in an evaluation.

560.    On October 6, 2025, the doctor went to Ms. Spell's home for  a wellness check, and once again no interpreter is provided. Ms. Spell  tells the doctor she wants to see and "ASL therapist" but that never occurs.

561.    On October 11, 2025,  Ms. Spell decompensated and was picked up by the Fort Myers Police Department again and taken to SalusCare. No interpreter was provided for the exchange with law enforcement.

**Baker Act Twenty Three - Committed by Baker Act to SalusCare in Fort Myers October 11, 2025 to October 13, 2025 - 3 day commitment.**

562.    Ms. Spell was involuntarily admitted to SalusCare for the *fourth time* and DCF was informed of the admission. Soon after admission Ms. Spell executed a contract with SalusCare outlining the services she would receive.

563.    Upon admission Ms. Spell was provided with the DCF Interpreting Form and indicated she needs an interpreter. But  Ms. Spell was not provided with an ASL interpreter upon admission even though she arrives at the facility at approximately 9.00 am. She was instead subjected to many evaluations without the benefit of an interpreter and was forced to try to write with staff.

564.    On October 12, 2025,  Ms. Spell was finally provided with an interpreter but most of the evaluations performed on October 11th (without an interpreter) are not repeated with the interpreter present.

565.    The treatment plan was essentially the same as the last three plans, and made reference to offering group therapy sessions. It appears she was provided with an interpreter for one group session.

566.    Ms. Spell authorized her mother to visit and call again, and Ms. Spell indicated that a calming strategy for her is to be able to call family and friends but SalusCare still failed to offer a videophone.

567.    On October 13, 2025, Ms. Spell received more treatment and was discharged, but no interpreter was provided on October 13, 2025.

568.    DCF was informed of the discharge.

569.    When released from SalusCare, Ms. Spell used substances and was taken

to Centerstone's psychiatrist but was not afforded an interpreter for the evaluation. The police were called and Ms. Spell calmly went with them to be Baker Acted again.

**Baker Act Twenty-Four - Committed by Baker Act to Park Royal Hospital on approximately October 14, 2025, to October 20, 2025-six-day commitment.**

570. Ms. Spell was admitted to Park Royal for the *fifth* time, and DCF was informed of the admission. Soon after admission Ms. Spell executed a contract with Park Royal outlining the services she would receive.

571. The records reflect Ms. Spell requested ASL interpreters for effective communication, and the fact she was Deaf is indicated on many pages of her medical records. The staff indicate in several sections of the records they are "familiar with the PT as she has been inpatient with us before."

572. When Ms. Spell was provided with interpreters it was only through VRI. However, the staff noted Ms. Spell was "unable to answer questions with the interpreter machine due to her psychosis and manic behavior."

573. Ms. Spell is responding to internal stimuli in ASL, but because the staff does not know ASL no one knows what she is saying.

574. Ms. Spell is provided with an interpreter for the initial psychiatric evaluation but because it was through VRI it was not effective due to her mania. When Park Royal has her undergo a second opinion for commitment, and when it performs the daily assessments of the need for commitment, interpreters are not provided.

575. The Treatment Plan indicated she shall attend group therapy and two recreational groups per day as part of her treatment. Ms. Spell attended one session while there, but interpreters were not offered for the group sessions.

576. Interpreters were not provided for her medical evaluations, even after she fell on a wet floor at the facility.

577. Park Royal still failed to offer a videophone for Ms. Spell's use.

578. Ms. Spell was discharged on October 20, 2025, and DCF was informed

of the discharge.

### October 20, 2025 – October 24, 2025, Ms. Spell received services in the community from the Centerstone FACT Team.

579.   Ms. Spell began receiving services again from the Centerstone FACT Team. The medication delivery to her home would now be modified to three days per week although on some days the staff were at her house multiple times per day.

580.   On approximately October 22, 2025, the FACT medical staff came to Ms. Spell's home and administered Ms. Spell a second injection of the long-acting psychotropic drug Abilify. This injection was made in error because Ms. Spell had already received the injection while at Park Royal Hospital. But due to the failure of Centerstone to provide an interpreter Ms. Spell was unable to tell the staff about the medications she already received.

581.   The erroneous injection caused her to exhibit an altered mental state.

582.   On October 24, 2025, while at her home Ms. Spell told Centerstone she needed to see the doctor because her medicine was "not right." But due to the absence of an interpreter the gravity of the medication error was not understood.

583.   Ms. Spell decompensated further, and now that Centerstone had changed their visits to every three days they did not know Ms. Spell was taken to Lee Memorial Hospital for an evaluation, then to Park Royal to be Baker Acted again.

584.    Upon information and belief ASL interpreters were not provided at Lee Memorial Hospital.

### Baker Act Twenty-Five - Committed by Baker Act to Park Royal Hospital on October 25, 2025, to October 30, 2025- five day commitment.

585.   On October 25, 2025, Ms. Spell was admitted to Park Royal for the sixth time and DCF was informed of the admission.

586.    Soon after admission Ms. Spell executed a contract with Park Royal memorializing the services she would receive. The Treatment Plan was essentially the same as the former ones which included psychiatrist sessions, evaluations and clinical therapy sessions.

587.    Soon after her arrival she underwent a psychiatric evaluation without the provision of an interpreter. The next day she was subjected to a second opinion on the commitment, and an interpreter was not provided for that evaluation.

588.    Ms. Spell was pacing the hallways and is responding to internal stimuli in ASL. But because the staff do not know sign language, they do not know what she is saying, or what she may need.

589.    Although group therapy was part of Ms. Spell's treatment plan, interpreters were not regularly provided. On information and belief when interpreters were provided it is only  through VRI which is not effective for Ms. Spell in her altered state.

590.    Ms. Joza speaks to the administration and complains about their failure to provide Ms. Spell interpreters for the treatment.

591.    Park Royal still failed to offer a videophone to allow Ms. Spell to place phone calls.

592.    While Ms. Spell was at Park Royal Ms. Joza called Centerstone to make sure the medication delivery issue is straightened out and wants to know what can be done to get her daughter some drug rehabilitation treatment.

593.    Ms. Joza also contacted an ASL interpreter referral agency to seek help with securing onsite interpreters for her daughter's interactions with Centerstone.

594.    Ms. Joza was advised that Ms. Spell would be discharged on October 30, 2025. Ms. Joza begged the hospital to keep Ms. Spell at the facility until the staff had her evening medication to discharge her with. This request was made to avoid what happened to Ms. Spell when SalusCare discharged her daughter without her medication in September 2025 causing her to immediately decompensate.

80

595.    On October 30, 2025, Centerstone staff picked up Ms. Spell, who was discharged *without* her evening Haldol dose prescription and brought her home.

596.    DCF was informed of the discharge.

597.    She is seen by the Centerstone's psychiatrist on October 30, 2025, without an interpreter making it impossible to discuss her medication.

598.     Without her evening dose of Haldol, Ms. Spell decompensated and is found wandering in the streets by law enforcement. She was taken to SalusCare,  and no interpreter provided for the exchange with law enforcement.

### Baker Act Twenty-Six - Committed by Baker Act to Salus Care, October 31, 2025, to  November 3, 2025- four-day commitment.

599.    At approximately 10.30 am Ms. Spell arrives at SalusCare for her *fifth* admission. DCF was advised of her involuntary admission.

600.    Soon after admission Ms. Spell executed a contract with SalusCare outlining the services she would receive.

601.    Even though Ms. Spell indicated on the DCF Interpreting Form she needed an interpreter, and she arrives as early as 10.30 am, once again, she is not provided with an interpreter until the next day at 1.30 pm. Regardless of the absence of the interpreter, SalusCare performed evaluations on her by forcing her to write notes and attempt to lipread.

602.    During the exams performed without an interpreter SalusCare noted "Information was extremely limited and difficult to obtain due to communication barriers, as the patient is deaf."

603.    When Ms. Spell is finally afforded an onsite interpreter, she explained to the staff that "I get really upset that people don't understand me." It is also noted that "Heather is somewhat traumatized by the police not understanding her and assume she is violent or mentally ill. Heather feels she shouldn't have been Baker Acted."  Yet

with that heartfelt observation SalusCare failed to provide an interpreter for the full duration of her treatment.

604.   The treatment plan was essentially the same as the ones before which recommended her participation in groups at the facility.

605.   During this commitment,  like the ones before, the records reflect Ms. Spell had no telephone restrictions, yet SalusCare still did not provide a videophone for Ms. Spell to place calls to her family.

606.   It appears Ms. Spell was provided with an onsite interpreter for only a portion of November 3, 2025, and then discharged *without* her medications again. DCF was informed of the discharge.

**November 3, 2025 – November 6, 2025, Ms. Spell received services in the community from the Centerstone FACT Team.**

607.   When released from SalusCare she received services from the Centerstone FACT Team. Centerstone still refused to provide interpreters, and Ms. Joza was still trying to secure interpreters for Centerstone and trying to resolve medication issues caused by the failure of her daughter's medical providers to secure interpreters.

608.   On November 5, 2025, Centerstone scheduled a telehealth appointment with an Advanced Registered Nurse Practitioner (ARNP) at Ms. Spell's home  by way of Zoom. Centerstone notes that Ms. Spell "had difficulty reading lips because it was on video" and stated they will "try" to  secure an interpreter for the next appointment with the ARNP.

609.   Later that day Ms. Spell refused to take her medicine and was acting erratically. Her mother called the non-emergency line for the police department and requested the special mental health response unit check on Ms. Spell.

610.    The mental health unit responded to the duplex where Ms. Spell lives, but no interpreter was provided for the exchange.

611.   Ms. Spell was first transported to Lee Memorial Hospital, then Baker Acted to Park Royal again.

**Baker Act Twenty-Seven - Committed by Baker Act to Park Royal Hospital on November 6, 2025 to November 14, 2025- eight-day commitment.**

612.   On November 6, 2025, Ms. Spell was admitted to Park Royal for the seventh time, and DCF was informed of the admission.

613.   Soon after admission Ms. Spell executed a contract with Park Royal memorializing the services she would receive.

614.   The treatment plan was essentially the same plan used in prior admissions, which included participating in her psychiatric follow up evaluations, attending clinical groups and engaging with the staff. The medical records indicate Ms. Spell has multiple admissions to this facility.

615.   When interpreters were provided it was only by way of VRI.

616.   Ms. Spell underwent several psychiatric evaluations, and most were performed without an interpreter. Ms. Spell also underwent several physical evaluations without the provision of interpreters.

617.   The medical records indicate Ms. Spell was talking to herself and responding to internal stimuli in ASL, but no one at the facility is fluent in ASL.

618.   The group sessions do not appear to have offered interpreting services for Ms. Spell. Ms. Spell only attended one group which was held outside and the focus was to allow patients to get some fresh air.

619.   Park Royal still failed to offer a videophone.

620.   While Ms. Spell is at Park Royal Ms. Joza is in contact with Centerstone making sure Ms. Spell is discharged with her medicine and confirming that interpreting services are going to be provided by Centerstone at Ms. Spell's first appointment with them.

621.   On November 11, 2025, while Ms. Spell was in the hospital, a Licensed

Clinical Social Worker (LCSW) from Centerstone came to meet with her to discuss entering a 28-day drug rehabilitation program. No interpreter was provided for the meeting with Ms. Spell.

622. Once Ms. Joza learns of her daughter's discharge date, she secures a sign language interpreter to be used at the first meeting with Centerstone right after the discharge on November 14, 2025.

623. On November 14, 2025, Ms. Spell was discharged, and DCF was informed of the discharge.

**November 14, 2025- November 23, 2025, received services from the Centerstone FACT team.**

624. As soon as Ms. Spell is discharged, she is seen by Centerstone, and the onsite sign language interpreter that Ms. Joza arranged came to the meeting.

625. Efforts are being made to get Ms. Spell accepted into the residential drug treatment program, Charlotte Behavioral Health Care (Charlotte BHC), in Punta Gorda, Florida. Upon discussion with the rehab program, it appeared Ms. Spell would be a good fit and Ms. Joza is told they have an ASL interpreter on staff. However, an assessment was needed.

626. On November 20, 2025, Plaintiffs' counsel filed a complaint with Centerstone for the failure to provide interpreters for Ms. Spell.

627. On November 21, 2025, Ms. Spell was seen by the ARPN without an interpreter, then is taken by Centerstone for an assessment at Charlotte Behavioral Health Care. Prior to the assessment Plaintiffs were told she would be provided with an interpreter for the assessment, but no interpreter was provided. Ms. Spell is told she has been accepted into the program but just needs to complete an intake after the assessment. Charlotte BHC told Ms. Spell and her mother that it will provide interpreters once Ms. Spell begins the program.

628. On November 23, 2025, Ms. Spell appeared to become delusional, and

was having difficulty communicating with roommates and staff. She asks her neighbor to call 911.

629.   Law enforcement responded to the call, but no interpreter was provided for the exchange with law enforcement. Ms. Spell was first taken to Lee Memorial Hospital then transported to Park Royal Hospital again and Baker Acted.

**Baker Act Twenty-Eight - Committed by Baker Act to  Park Royal Hospital November 23, 2025 to November 29, 2025- six-day commitment.**

630.   Ms. Spell was admitted to Park Royal for the *eighth* time, and DCF was informed of the admission.

631.   Soon after admission Ms. Spell executed a contract with Park Royal outlining the services she would receive. The medical records indicate Ms. Spell has been there many times before.

632.   The treatment Plan was essentially the same plan used for the last seven admissions. The records show she requested ASL interpreters upon admission. A VRI interpreter was used during a portion of her initial intake, and the medical records reflect her need for an interpreter.

633.   Like before, when interpreters were provided it is only through VRI.

634.   Park Royal offered approximately two clinical therapy groups per day. Ms. Spell only attended one session during the six days, and that session consisted of an opportunity to sit outside and enjoy some fresh air. She did not participate in any other groups, and the notes do not indicate that Park Royal offered her an interpreter for the other group sessions.

635.   While Ms. Spell was there,  Ms. Joza spoke to a supervisor at the facility

requesting a phone call with her daughter, and since Park Royal had no videophone, they allowed Ms. Spell to use a *facility cell phone* [14] to make a facetime call. The absence of the videophone is documented in Ms. Spell's medical records.

636.   But during the call another patient was trying to grab the phone from Ms. Spell and a staff member stepped in and said out loud, there would be no calls. Ms. Joza then reported this event to a supervisor who failed to act to ensure Ms. Spell could at least speak to her mother through Facetime.

637.   Ms. Joza sent an email message to the supervisors advising she needs to speak to her daughter and again requested a phone call be set through a cell phone since the facility had no videophone.

638.   On November 26, 2025, Ms. Spell is to be transferred to the Charolotte BHC. Charlotte BHC indicates Saturday, November 29, 2025, is the date it said it would be ready to accept Ms. Spell as a patient. A decision was made to keep Ms. Spell at Park Royal until she can be directly transferred to Charlotte BHC to hopefully limit the possibility of relapsing and rapid readmission.

639.   On November 29, 2025, Ms. Spell was discharged and picked up by the Centerstone FACT Team and taken to Charlotte Behavioral Health Care. DCF was informed of the discharge.

**November 29, 2025- November 30, 2025, – received services from Charlotte Behavioral Health Care.**

640.   Ms. Spell arrived at the Charlotte BHC in the afternoon of November 29, 2025.

641.   Charlotte BHC is a contractor of the Department of Children and Families. Soon after admission Ms. Spell executed a contract with Charlotte BHC memorializing the services she would receive.

---

[14] At this time Ms. Spell did not have her own cell phone.

642.    Although formally told interpreters would be provided there were no interpreters provided.

643.    Ms. Spell tried her best to make it through the admission process and other activities but became very aggravated due to communication issues. She was told two times now interpreters would be provided, and now Charlotte BHC says if she stays, she will eventually be provided with an interpreter. But Ms. Spell does not believe them.

644.    In the very late hours of November 30, 2025, to the early hours of December 1, 2025, Ms. Spell tells Charlotte BHC she is leaving. A little after midnight Charlotte BHC calls Ms. Joza to inform her of Ms. Spell's departure. Ms. Joza then calls a ride share company to pick Ms. Spell up and bring her back home.

**December 1, 2025 - December 6, 2025, received services from the Centerstone FACT Team.**

645.    Centerstone continued to provide services in Ms. Spell's home without interpreters.

646.    On December 6, 2025, Ms. Joza visited Ms. Spell to assist her with grocery shopping and other tasks. Ms. Spell was having a bad day, and became physical, and the Fort Myers Police Department non-emergency line was called for help.

647.    No interpreter was provided for the exchange with law enforcement, and Ms. Spell was taken to SalusCare to be evaluated.

**Baker Act Twenty-Nine - Committed by Baker Act to SalusCare approximately December 6, 2025, to December 8, 2025- two-day commitment.**

648.    On December 6, 2025, Ms. Spell was admitted to SalusCare for sixth time, and DCF was informed of the admission.

649.    Soon after admission Ms. Spell executed a contract with SalusCare

memorializing the services she would receive.

650.   On information and belief interpreters were provided upon occasion but not for the full duration of her treatment.

651.   SalusCare still failed to offer a videophone to provide phone access for Ms. Spell.

652.   Ms. Spell was discharged on approximately December 8, 2025, and DCF was informed of the discharge.

**December 8, 2025 - December 18, 2025, received services in the community from the Centerstone FACT Team.**

653.   Ms. Spell began to receive services from the FACT team again, and on December 10, 2025, was seen by Centerstone with an interpreter secured by Ms. Joza. Centerstone still refused  to secure interpreting services for Ms. Spell.

654.   She was housed with other FACT patients who do not know ASL and was feeling despondent. Without interpreters being provided Ms. Spell was having difficulty managing her mental health.

655.   Ms. Spell began to decompensate, and was taken to HCA West Fort Myers Hospital then to Park Royal to be Baker Acted again.

**Baker Act Thirty - Committed by Baker Act to Park Royal on December 18, 2025 to December 23, 2025 - 5 day commitment.**

656.   On approximately December 18, 2025, Ms. Spell was admitted to Park Royal for an involuntary Baker Act for the ninth time, and DCF was informed of the admission. Soon after admission Ms. Spell executed a contract with Park Royal memorializing the services she would receive.

657.   The records indicate she needs an interpreter, uses ASL and has communication barriers e.g. "patient is deaf-needs sign language interpreter." The treatment plan was essentially the same as the prior admissions.

658.     The initial psychiatric evaluation, the second opinion obtained to determine if Ms. Spell requires hospitalization, and the follow up evaluations appear to have been performed without an interpreter.

659.     Similar to the other admissions Ms. Spell was required to communicate with many medical staff members and the records indicate she has been there several times before. In this admission, like the others, she lists her mother Carla Joza as a contact person.

660.     The staff notes how Ms. Spell is interested in receiving care and aware she needs further assistance. Even after all this time,  Ms. Spell is still trying to become well, but her journey is arduous and fraught with barriers.

661.     Interpreters were provided upon occasion but not for the full duration of her treatment and only through VRI. The records do not reflect if she was provided with interpreters for the medical evaluations she underwent while admitted. Ms. Spell only attended one group session while there, and remarkably on that date it states VRI was offered.

662.     Park Royal still failed to offer a videophone for Ms. Spell to place calls.

663.     Ms. Spell was discharged on December 23, 2025, and DCF was informed of the discharge.

**December 23, 2025 – December 28, 2025, received services in the Community through the Centerstone FACT Team.**

664.     Once back to Centerstone, Ms. Joza spoke at length with the team lead at Centerstone stressing the importance of providing on-site interpreters for Ms. Spell.

665.     A home visit was scheduled with Ms. Spell on December 26, 2025, and during the visit Ms. Spell was to speak to the APRN through Zoom. Even though Ms. Spell and her mother have been requesting onsite interpreters for the medical exchanges, Centerstone still refused and only agrees to provide an interpreter through VRI.

666.   Ms. Spell was subjected to an evaluation with the APRN on Zoom, while watching a VRI interpreter who was on another device. Ms. Spell was unable to access the treatment, and the requirement to watch everyone on small screens made Ms. Spell mad and she walked out on the home visit.

667.   This appears to be the first time since Ms. Spell became their client on August 12, 2025, that Centerstone secured any type of interpreter.

668.   Due to the debacle with the Zoom evaluation and the VRI interpreter, Centerstone then has Ms. Joza continue to secure *onsite* interpreters through Ms. Spell's insurance carrier instead of securing the interpreters themselves.

669.   On approximately December 28, 2025, the side effects from Ms. Spell's psychotropic drugs began to cause great difficulty, and she became aggressive causing her roommate to call law enforcement.

670.   Law enforcement responded, no interpreter was provided for the exchange, and Ms. Spell was taken back to SalusCare.

## Baker Act Thirty-One - Committed by Baker Act to SalusCare December 28, 2025, to December 31, 2025- three-day commitment.

671.    On approximately December 28, 2025, Ms. Spell was Baker Acted  to SalusCare for the *seventh time*. DCF was informed of the admission.

672.   Soon after admission Ms. Spell executed a contract with SalusCare outlining the services she would receive.

673.   On information and belief interpreters were provided upon occasion but not for the full duration of her treatment.

674.   SalusCare still failed to offer a videophone to provide phone access for Ms. Spell.

675.   While Ms. Spell is at the hospital Ms. Joza secures an interpreter for Centerstone, who will meet with her daughter on December 30, 2025, right after her discharge. Then the discharge date gets changed to December 31, 2025, and instead of

Centerstone securing an interpreter, it requires Ms. Joza, who works full time and is raising Ms. Spell's daughters,  to call the insurance carrier to change the date of the interpreter needed by Centerstone.

676.   Ms. Spell was discharged on  December 31, 2025, and  DCF was informed of the discharge.

677.   Ms. Spell continues to be  Baker Acted to DCF providers after December 31, 2025 and denied meaningful access to services based on her disabilities.

## COUNT ONE
## VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT AS TO RECSOL AND THE DAVID LAWRENCE CENTER ON BEHALF OF BOTH PLAINTIFFS

678.   Plaintiffs repeat and re-allege allegations ¶¶ 1-77, 142-193 and ¶ 677 in support of their claims against RecSol. Plaintiffs repeat and re-allege allegations ¶¶  1-141,194-221,239-320,412-425,436-457,467-470,480-493,505-508,512-516  and  ¶ 677 in support of their claims against The David Lawrence Center.

679.   In Count I, Plaintiffs seek declaratory relief and permanent injunctive relief, pursuant to Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181, *et seq.*, and its implementing regulations.

680.   Plaintiff Ms. Spell is Deaf, and her hearing and mental health disabilities substantially limit major life activities as defined by Title III of the ADA.

681.   Plaintiff Ms. Joza is an individual who is known to have a relationship or association with Ms. Spell and shall not be excluded or otherwise denied equal services, programs, or activities based on that association. 42 U.S.C. § 12182 (b) (1) (E).

682.   Plaintiffs meet the essential eligibility requirements for Defendants' services at all times material hereto and are entitled to the protections of the ADA under 42 U.S.C. § 12182, *et seq.*, and its implementing regulations.

91

683.    RecSol and the DLC are places of public accommodation, pursuant to 42 U.S.C. § 12181(7)(F) and are subject to the mandates of Title III of the ADA and its implementing regulations.

684.    The ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182.

685.    Defendants failed to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182 (b) (2) (A) (ii).

686.    Defendants failed to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of <u>auxiliary aids and services</u>, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the goods, services, facility, privilege, advantage, or accommodation being offered or would result in an undue burden. 42 U.S.C. § 12182 (b) (2) (A) (iii) (emphasis added).

687.    The term "auxiliary aids and services" includes: "Qualified interpreters on-site or through video remote interpreting (VRI) services, notetakers; real-time computer-aided transcription services; written materials; exchange of written notes… closed caption decoders…or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." 28 C.F.R. § 36.303 (b) (1).

688.    A qualified interpreter means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary

92

specialized vocabulary. 28 C.F.R. § 36.104.

689.    In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 36.303 (c) (1) (ii).

690.    A public accommodation that offers a customer, client, patient, or participant the opportunity to make outgoing telephone calls using the public accommodation's equipment on more than an incidental convenience basis shall make available accessible public telephones, TTYs, or other telecommunications products and systems for use by an individual who is deaf or hard of hearing, or has a speech impairment. 28 C.F.R. § 36.303 (d) (2).

691.    A public accommodation that chooses to provide qualified interpreters via VRI service shall ensure that it provides—

> (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;
> (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;
> (3) A clear, audible transmission of voices; and
> (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI.

28 C.F.R. §§ 36.303 (f) (1-4).

692.    Defendants violated  28 C.F.R. § 36.230  by requiring an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit available under this part that such individual chooses not to accept. Defendants repeatedly forced Ms. Spell to use VRI after her repeated denial of the accommodation. Ms. Spell's denials were not based on a *preference* of accommodation but based on the sheer volume of times the device simply did not function and due to its therapeutic

incompatibility with  the medical exchanges for which it was being used. Defendants documented Ms. Spell's and her mother's ongoing denial of the VRI and also noted at times Ms. Spell closed her eyes when the device was thrust upon her. But Defendants forced its use  anyway in violation of the regulations.

693.   As a result of Defendants' actions described above, Plaintiffs suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, mental anguish, and a deprivation of their rights to non-discrimination on the basis of disability.

694.   Plaintiff Joza was personally excluded from the services of being able to receive phone calls from her daughter and discriminated against when required to act as DLC's proxy ADA Coordinator. e.g. a surcharge. Ms. Joza was treated differently than other nondisabled parents of a mental health patient solely on her association with a Deaf patient.

695.   In engaging in this unlawful conduct described above, Defendants acted maliciously to damage the rights and dignity of Plaintiffs.

696.   Defendants' actions were intentional and violated the rights of the Plaintiffs by their refusal to comply with the ADA.  Defendants were put on full notice of their obligations to abate such discriminatory actions and failed to do so.

697.   Plaintiffs have been injured and aggrieved by and will continue to be injured and aggrieved by Defendants' intentional discrimination. As an individual with longstanding mental health issues, and the mother of the same, Plaintiffs shall continue to use Defendants' services, as further described above.

**WHEREFORE**, Plaintiffs respectfully request the relief listed  below:


## COUNT TWO
## VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT AS TO THE DEPARTMENT OF CHILDREN AND FAMILIES ON BEHALF OF BOTH PLAINTIFFS

698.    Plaintiffs re-allege all the previous allegations contained within paragraphs ¶¶1-677 in support of their claims against Defendant, The Department of Children and Families.

699.    In Count II, Plaintiffs seek declaratory relief and permanent injunctive relief, pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and its implementing regulations.

700.    Plaintiff Ms. Spell is Deaf, and her hearing and mental health disabilities substantially limit major life activities as defined by Title II of the ADA.

701.    Plaintiff Ms. Joza is an individual who is known to have a relationship or association with Ms. Spell and shall not be excluded or otherwise denied equal services, programs, or activities based on that association. 28 C.F.R. §§ 35.130 (g), 35.160 (a) (2).

702.    Plaintiffs meet the essential eligibility requirements for Defendant's services at all times material hereto and is entitled to the protections of the ADA under 42 U.S.C. § 12132, *et seq.*, and its implementing regulations.

703.    Defendant is a public entity pursuant to 42 U.S.C. § 12131 (1), and is subject to the mandates of Title II of the ADA and its implementing regulations.

704.    No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.  42 U.S.C. § 12132.

705.    The Florida Department of Children and Families is responsible for planning, managing, and evaluating a statewide program of behavioral health services and supports, including community programs, crisis services, state residential treatment facilities, and children's behavioral health services.

706.    DCF contracts its behavioral health services out to many contractors, to include RecSol and DLC, as outlined in this Complaint, and it knowingly allowed all contractors referenced in this Complaint to violate the statute.

707.    A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability— (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. 28 C.F.R. §§ 35.130 (b) (1) (i-iii).

708.    A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability— Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program; (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. 28 C.F.R. §§ 35.130 (b) (1) (v), (vii).

709.    A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. 28 C.F.R. §§ 35.130 (3) (i-ii).

710.    Defendant must provide effective auxiliary aids to ensure deaf and hard of hearing people can access their services. The term auxiliary aids and services include qualified interpreters, or other effective methods of making aurally delivered

materials available to individuals with hearing impairments. 42 U.S.C. §§ 12103 (1) (A),(C). This includes equitable access to the telephone.

711.   Defendant failed to provide qualified interpreters.  A qualified interpreter means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary.  28 C.F.R. § 35.104.

712.   Defendant failed to give "primary consideration" to the requests of individuals with disabilities in determining what auxiliary aids and services are necessary. 28 C.F.R. § 35.160 (b)(2). (Emphasis added). In order to be effective, auxiliary aids and services must be provided in accessible formats, in a *timely manner,* and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 35.160 (b) (2).(emphasis added).

713.   A public entity that chooses to provide qualified interpreters via VRI services shall ensure that it provides—

> (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;
> (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;
> (3) A clear, audible transmission of voices; and
> (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI.

28 C.F.R. §§ 35.160 (d) (1-4).

714.   A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to

provide that individual or group with the nondiscriminatory treatment required by the Act or this part. 28 C.F.R. § 35.130 (f).

715.   Defendant imposed a surcharge when it required Ms. Joza to secure the interpreters for her daughter on behalf of DCF contractors.

716.    A public entity cannot  require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept. 28 C.F.R. § 35.130 (e) (1).

717.   Defendant repeatedly forced Ms. Spell to use VRI after her repeated declinations to accept the accommodation. Ms. Spell's denials were not based on a *preference* of accommodation but based on the sheer volume of times the device simply did not function and due to its therapeutic incompatibility with the medical exchanges for which it was being used.

718.   DCF contractors noted her declination of the accommodation when  Ms. Spell physically shoved the VRI device away,  purposely closed her eyes while it was running (or failing), or ran out of the room when she saw it was once again being thrust upon her.  The accommodation was not *accepted* as required by the regulations, but DCF and its contractors  intentionally and improperly forced the accommodation on Ms. Spell in violation of the regulations.

719.   A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered. 28 C.F.R. § 35.130 (8).

720.   Defendant imposes eligibility standards, and screened her out by refusing to offer services accessible to Deaf people which resulted in Ms. Spell being deemed too expensive, based on her disability, to receive services from DCF contractors.

721.   A public entity shall make reasonable modifications in policies, practices,

or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130 (7) (i). Defendant consistently failed to make reasonable modifications.

722.   A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130 (d). Ms. Spell was consistently isolated  and forced into elongated commitments due to DCF's failure to provide accessible community-based mental health services.

723.   Defendant's actions were intentional and violated the rights of the Plaintiff Spell, by its refusal to provide reasonable accommodations, by subjecting her to unqualified interpreters through non-compliant VRI and institutionalizing Ms. Spell to the *least* integrated settings for elongated periods, due to its failure to offer behavioral health services accessible to Deaf individuals.

724.   Defendant's actions were intentional and violated the rights of Plaintiff Spell, when supporting a network of non-compliant contractors, failing to provide modifications to policies and procedures, denying service based on disability and denying the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

725.   Defendant's actions were intentional and violated the rights of the Plaintiff Joza, when it personally deprived her of the service of telephone access to her daughter, required she secure interpreters for her daughter and treated her differently than non-disabled parents of a mental health patient  solely due to her association with a Deaf patient.

726.    Defendant's officials had the knowledge and the authority to address the discrimination and to institute corrective measures but failed to act.

727.   Plaintiffs have been injured and aggrieved by, and will continue to be

injured and aggrieved by Defendant's intentional discrimination. Plaintiffs have suffered damages as a result of this discrimination.

728.    As an individual with longstanding mental health issues, and the mother of the same, Plaintiffs shall continue to use Defendant's services, as further described above.

WHEREFORE, Plaintiffs respectfully request the relief listed below:

## COUNT THREE
## VIOLATIONS OF SECTION 504 OF THE REHAB ACT AS TO ALL DEFENDANTS ON BEHALF OF BOTH PLAINTIFFS

729.    Plaintiffs repeat and re-allege allegations ¶¶ 1-677 in support of their claims against the Department of Children and Families. Plaintiffs repeat and re-allege allegations ¶¶1-77,142-193, and ¶ 677 in support of their claims against RecSol. Plaintiffs repeat and re-allege allegations ¶¶ 1-141,194-221,239-320,412-425,436-457,467-470,480-493,505-508,512-516 and ¶ 677 in support of their claims against The David Lawrence Center.

730.    Plaintiff Ms. Spell is Deaf, and her disabilities substantially limit major life activities, and she is therefore considered to be an individual with a disability under Section 504.

731.    Plaintiff Ms. Joza is a non-disabled person who was personally excluded, personally denied benefits, or personally discriminated solely based on her association with a disabled person. 45 C.F.R. § 84.68 (g).

732.    Count III is brought against Defendants as a claim for discrimination against people with disabilities in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, which provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in Section 705 (20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance.

733.   Defendants are recipients of federal financial assistance including, but not limited to, acceptance of federal block grants (DCF), Medicare and Medicaid funds, and are, therefore, subject to the requirements of Section 504. 29 U.S.C. § 794.

734.   Each time Ms. Spell was committed, DCF and its contractors entered into a contract with Plaintiffs outlining the services to be provided, and Defendants breached those contracts resulting in damages.

735.   Defendants have intentionally discriminated against Plaintiffs on the basis of Ms. Spell's disabilities in violation of 29 U.S.C. §794 and its implementing regulations.

736.   Such discrimination includes, but is not limited to: (1) denying benefits or services; (2) denying a qualified person with a disability an opportunity to receive benefits or services that are not equal to that offered persons without disabilities; (3) Providing benefits or services that are not as effective (as defined in § 84.4(b)) as the benefits or services provided to others; (4) Providing benefits or services in a manner that limits or has the effect of limiting the participation of qualified persons with disabilities. 45 C.F.R. §§ 84.52 (a) (1-4).

737.   Defendants failed to provide auxiliary aids and services, and denied effective communication to Plaintiffs. 45 C.F.R. § 84.77 (b) (1).

738.   Defendants  ignored Ms. Spell's right to decline the  accommodation of VRI, and forced her to use VRI in violation of the regulations.

739.   Defendants DCF and DLC imposed an improper surcharge when it required Ms. Joza to secure interpreters for her Deaf daughter. 45 C.F.R. § 84.68 (f).

740.   Defendant DCF failed to provide community-based services that resulted in unnecessary institutionalization or serious risk of institutionalization.  45 C.F.R. § 84.76 (d) (4).

741.   Defendant DCF directly, and through contracting violated Plaintiffs'

rights under Section 504. 45 C.F.R. §§ 84.68 (b) (1) (i-iii)(v) (vii); (3)(i-iii).

742.   Defendants' actions were intentional and with reckless disregard for the rights of the Plaintiffs, when Plaintiffs repeatedly made affirmative requests to be accommodated to officials of the Defendants' who had actual knowledge of the discrimination and at a minimum had the authority to institute corrective measures but failed to do so.

743.   As a result of Defendants' actions described above, Plaintiffs suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, loss of the benefit, economic damages, expectation interest and a deprivation of their rights to non-discrimination on the basis of disabilities. In engaging in this unlawful conduct described above, Defendants acted intentionally and maliciously to damage the rights and dignity of Plaintiffs.

744.   Plaintiffs have been injured and aggrieved by and will continue to be injured and aggrieved by Defendants' intentional discrimination. As an individual with longstanding mental health issues, and the mother of the same, Plaintiffs shall continue to use Defendants' services, as further described above.

**WHEREFORE**, Plaintiffs respectfully request the relief listed below:

**COUNT FOUR**
**VIOLATIONS OF SECTION 1557 OF THE AFFORDABLE CARE ACT AS TO ALL DEFENDANTS ON BEHALF OF  BOTH PLAINTIFFS**

745.   Plaintiffs repeat and re-allege allegations ¶¶ 1-677  in support of their claims against the Department of Children and Families. Plaintiffs repeat and re-allege allegations ¶¶1-77,142-193 and ¶ 677 in support of their claims against RecSol. Plaintiffs repeat and re-allege allegations ¶¶ 1-141,194-221,239-320,412-425,436-457,467-470,480-493,505-508,512-516 and ¶ 677 in support of their claims against The David Lawrence Center.

746.   Plaintiff  Ms. Spell is Deaf, and her disabilities substantially limit major

life activities. Accordingly, she is an individual with a disability as defined under 29 U.S.C. § 705(20) and 42 U.S.C. § 12102. *See* 42 U.S.C. § 18116; 45 C.F.R. § 92.101.

747.   Plaintiff Ms. Joza is a non-disabled person who was personally aggrieved against, excluded, personally denied benefits, or otherwise discriminated against because of her association with a Deaf person.  45 C.F.R. § 92.209.

748.   Each Defendant is a "healthcare program or activity," receiving federal financial assistance, including Medicaid and Medicare reimbursements. They are, therefore, a covered entity under 42 U.S.C. § 18116.

749.   Section 1557 of the Patient Protection and Affordable Care Act states an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]. 42 U.S.C. § 18116 (a).

750.   Federal regulations implementing the ACA provide that a covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with the standards found at 28 C.F.R. § 35.130 and 35.160 through 35.164. 45 C.F.R. § 92.202(a).

751.   The regulations also require that a "covered entity must provide appropriate auxiliary aids and services where necessary to afford individuals with disabilities an equal opportunity to participate in, and enjoy the benefits of, the health program or activity in question. Such auxiliary aids and services must be provided free of charge, in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability."  45 C.F.R. § 92.202(b).

752.   The definition of a *qualified interpreter* for an individual with a disability

pursuant to ACA is stricter than the definition under the ADA. Under ACA a qualified interpreter means an interpreter who, via a video remote interpreting service (VRI) or an on-site appearance: (1) Has demonstrated proficiency in communicating in, and understanding: (i) Both English and a non–English language (including American Sign Language, other sign languages); or (ii) Another communication modality (such as cued-language transliterators or oral transliteration); (2) Is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary or terms without changes, omissions, or additions and while preserving the tone, sentiment, and emotional level of the original statement; and (3) Adheres to generally accepted interpreter ethics principles including client confidentiality. 45 C.F.R. § 92.4.

753. The standards for the use of video remote interpreting (VRI) pursuant to ACA are similar to the ADA relating to transmission quality, image size, audio quality and other requirements. 45 C.F.R. § 92.201(f). Defendants violated that regulation by providing inoperable VRI.

754. Defendants violated the regulations by requiring Ms. Spell to use VRI after she declined VRI as an accommodation. 45 C.F.R. § 92.201 (h).

755. Each time Ms. Spell was committed, DCF, RecSol, the DLC and the other DCF contractors entered into a contract with Plaintiffs outlining the services to be provided, and Defendants breached those contracts resulting in damages.

756. As set forth above, Defendants discriminated against Plaintiffs on the basis of Ms. Spell's disabilities in violation of the ACA and its implementing regulations.

757. Defendants have also failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA and failed to modify policies and procedures to abate discrimination.

758. Defendants' actions were intentional and with reckless disregard for the rights of the Plaintiffs, when Plaintiffs repeatedly made affirmative requests to be

accommodated to officials of the Defendants' who had actual knowledge of the discrimination and at a minimum had the authority to institute corrective measures but failed to do so.

759.   As a result of Defendants' actions described above, Plaintiffs suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, loss of the benefit, loss of opportunity, economic damages,  expectation interest and a deprivation of their rights to non-discrimination on the basis of disabilities. In engaging in this unlawful conduct described above, Defendants acted intentionally and maliciously to damage the rights and dignity of Plaintiffs.

760.   Plaintiffs have been injured and aggrieved by and will continue to be injured and aggrieved by Defendants' intentional discrimination. As an individual with longstanding mental health issues, and the mother of the same, Plaintiffs shall continue to use Defendants' services, as further described above.

**WHEREFORE**, Plaintiffs respectfully request the relief listed below:

**COUNT FIVE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO ALL DEFENDANTS ON BEHALF OF BOTH PLAINTIFFS**

761.   Plaintiffs repeat and re-allege allegations ¶¶ 1-677  in support of their claims against the Department of Children and Families. Plaintiffs repeat and re-allege allegations ¶¶1-77,142-193 and ¶ 677 in support of their claims against RecSol. Plaintiffs repeat and re-allege allegations ¶¶ 1-141,194-221,239-320,412-425,436-457,467-470,480-493,505-508,512-516  and ¶ 677 in support of their claims against The David Lawrence Center.

762.   Defendants deliberately or recklessly inflicted mental suffering upon Plaintiff Spell and Joza by repeatedly failing to provide meaningful access to services to Ms. Spell because she was Deaf, and, in doing so, denied access to needed mental health services she was entitled, resulting in extreme distress.

763.    Defendants deliberately or recklessly inflicted mental suffering upon Plaintiff Spell by repeatedly housing her in the most restrictive setting, and by denying her services in the most integrative setting.

764.    Defendants deliberately or recklessly inflicted mental suffering upon Plaintiff Spell by the ongoing failure to provide qualified interpreting services and repeatedly exposing her to VRI services which were inoperable and ineffective, resulting in extreme distress.

765.    Defendants deliberately or recklessly inflicted mental suffering upon Plaintiff Spell by elongating her involuntary commitments even after Ms. Spell had been cleared for discharge.

766.    Defendant DCF deliberately or recklessly inflicted mental suffering upon Plaintiff Spell and Joza by warehousing Ms. Spell through an inaccessible mental health system, and continuing to do so today.

767.    Defendant DCF deliberately or recklessly inflicted mental suffering upon Plaintiff Joza as she had to constantly advocate for her daughter's rights and could not provide emotional support to her daughter the same way a mother of a non-disabled daughter could.

768.    Defendants DCF and DLC deliberately or recklessly inflicted mental suffering upon Plaintiff Joza by requiring her to act as a proxy ADA Coordinator for DCF contractors and DLC when being forced to secure ASL interpreters for her daughter and continues to do so today.

769.    The conduct of the Defendants described herein was so outrageous it exceeds all bounds of decency and is utterly intolerable in a civilized community.

770.    The conduct of the Defendants was intended to and did cause Plaintiffs to suffer severe emotional distress. Plaintiff Spell also experienced language deprivation, isolation, fear, embarrassment, marginalization based on her disabilities and encountered prolonged degradation resulting in damages. Plaintiff Joza suffered severe emotional distress, fear, worry, degradation and economic damages.

WHEREFORE, Plaintiffs respectfully request the relief listed below:

## COUNT SIX
## VIOLATIONS OF THE FREE EXERCISE OF RELIGION CLAUSE  AS TO DEFENDANT THE DEPARTMENT OF CHILDREN AND FAMILIES ON BEHALF OF  HEATHER SPELL

771.    Plaintiff Spell repeats and re-alleges allegations ¶¶ 1-77, 382-383 and ¶ 677 in support of her claims against DCF in Count Six.

772.    Ms. Spell was involuntarily committed to the Northeast Florida State Hospital, and while confined at the state hospital, it offered religious services to the patients. Ms. Spell did not lose her right to the free exercise of  her religion because she had been committed.

773.    Ms. Spell and her mother made repeated requests for reasonable accommodations to afford Ms. Spell access to the free exercise of her religion. Those repeated requests were denied resulting in Ms. Spell being denied access to practice her religion.

774.    Defendant has a constitutional duty to accommodate Ms. Spell's sincerely held religious beliefs. Defendant's conduct, however, constitutes a failure to give reasonable accommodation to Ms. Spell's sincerely held religious beliefs by denying her access to the religious services at the state hospital.

775.    Ms. Spell's religious beliefs are burdened by Defendant when denying her access to religious services based on her disability.

776.    On its face, Defendant prohibits Ms. Spell access to religious services without a compelling reason for so doing. Accordingly, Defendant, acting under color of state law, have deprived and will continue to deprive Plaintiff of her free exercise rights guaranteed by the First and Fourteenth Amendment to the United States Constitution.

777.    Plaintiff Ms. Spell has been injured and aggrieved by and will continue

to be injured and aggrieved by Defendant's violations. As an individual with longstanding mental health issues, Plaintiff shall continue to use Defendant's services, as further described above.

WHEREFORE, Plaintiff respectfully requests the relief listed below:

## COUNT SEVEN
## VIOLATION OF ARTICLE I, SECTION II OF THE FLORIDA CONSTITUTION AS TO THE DEPARTMENT OF CHILDREN AND FAMILIES ON BEHALF OF HEATHER SPELL

778.   Plaintiff Spell repeats and re-alleges allegations in paragraphs ¶¶ 1-677 in support of her claims in Count Seven against DCF.

779.   Article I, Section II of the Florida Constitution prohibits discrimination against persons with disabilities. *See* Art. I, § 2, Fla. Const. ("No person shall be deprived of any right because of race, religion, national origin, or physical disability.").

780.   Persons with disabilities are a protected class under Article I, Section II.

781.   Ms. Spell is a member of that class as she is a person with physical and mental health disabilities.

782.   The state has violated Ms. Spell's rights under Article I, Section II by subjecting her to a discriminatory mental health system.

783.   The system discriminates against Deaf individuals by continually failing to provide services which provide meaningful access to Ms. Spell, allowing her to access the mental health system of the state.

784.   DCF has violated Ms. Spell's rights under Article I, Section II by denying her request to access and benefit from its mental health system, while affording similarly situated non-disabled individuals access to the services resulting in damages.

785.   Plaintiff Ms. Spell has been injured and aggrieved by and will continue

to be injured and aggrieved by Defendant's violations. As an individual with longstanding mental health issues, Plaintiff shall continue to use Defendant's services, as further described above.

WHEREFORE, Plaintiff respectfully requests the relief listed below:

## COUNT EIGHT
## VIOLATIONS OF THE BAKER ACT BY ALL DEFENDANTS
## ON BEHALF OF HEATHER SPELL

786.   Plaintiff repeats and re-alleges allegations ¶¶ 1-677 in support of her claims against the Department of Children and Families. Plaintiff repeats and re-alleges allegations ¶¶1-77,142-193 and ¶ 677 in support of her claims against RecSol. Plaintiff repeats and re-alleges allegations ¶¶ 1-141,194-221,239-320,412-425,436-457,467-470,480-493,505-508,512-516 and ¶ 677 in support of her claims against The David Lawrence Center.

787.   "…Each facility shall make available as soon as reasonably possible to persons receiving services a telephone that allows for free local calls and access to a long-distance service… The telephone shall be readily accessible to the patient and shall be placed so that the patient may use it to communicate privately and confidentially. The facility may establish reasonable rules for the use of this telephone, provided that the rules do not interfere with a patient's access to a telephone to report abuse pursuant to paragraph (f)." Fla. Stat. § 394.459 (5) (a).

788.   Each patient receiving mental health treatment in any facility shall have ready access to a telephone in order to report alleged abuse. The facility staff shall orally and in writing inform each patient of the procedure for reporting abuse and shall make every reasonable effort to present the information in a language the patient understands. A written copy of that procedure, including the telephone number of the central abuse hotline and reporting forms, shall be posted in plain view. Fla. Stat. § 394.459 (5) (f).

789.    Ms. Spells claims are based on Defendants' violation of the Baker Act statute when denied access to a telephone as required by Fla. Stat. §394.459. Her claims in this count do not involve the rendering of medical care.

790.    Ms. Spell and her mother made repeated requests to DCF, its Contractors, RecSol and DLC to ensure Ms. Spell could have ready access to the telephone. The Defendants failed to provide ready access to telephone use for Ms. Spell.

791.    Further, in violating the specified provisions of the Baker Act in the manner described, said Defendants caused the type of harm that these provisions were intended to prevent caused injury (detailed elsewhere in this Complaint) to Ms. Spell who is a member of the class of persons intended to be protected by these provisions of law. These violations resulted in damages to Ms. Spell.

792.    Plaintiff Spell has been injured and aggrieved by and will continue to be injured and aggrieved by Defendants' violations. As an individual with longstanding mental health issues, Plaintiff shall continue to use Defendants' services, as further described above.

WHEREFORE, Plaintiff respectfully requests the relief listed below:

### RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

A. The Court assume Jurisdiction on all claims;

B. Grant Declaratory Relief on all claims;

C. Grant both Plaintiffs injunctive relief from discrimination in violation of Title II and Title III of the Americans with Disabilities Act;

D. Grant both Plaintiffs injunctive relief from discrimination in violation of Section 504 of the Rehabilitation Act and the Affordable Care Act;

E. For violations of Section 504 of the Rehabilitation Act and the Affordable Care Act,  order Defendants to pay Plaintiffs  damages, to include

but not limited to, economic damages, expectation interest damages, lost opportunity damages, actual damages, lost educational opportunity damages, and or nominal damages in an amount to be determined at trial;

F. Order DCF to provide inpatient and outpatient mental health services by trained Deaf staff or staff fluent in ASL, for Ms. Spell when needed;

G. Order DCF to overhaul the services it provides through state hospitals to ensure they comply with the ADA, Section 504 and ACA and provide meaningful access for Deaf patients through trained Deaf staff or staff members fluent in ASL;

H. Order DCF to overhaul its 2019 Statewide Auxiliary Aids and Service Plan for Persons with Disabilities and Persons with Limited English Proficiency so that the plan is designed to properly monitor DFC's contractors' compliance with the anti-discrimination laws to ensure verifiable compliance with the ADA, Section 504 and ACA as to Deaf patients;

I. Order DCF to modify the involuntary examination initiating documents, required by Fla. Stat. § 394.463, to include questions which identify an individual as Deaf and requiring an ASL interpreter for treatment;

J. Order DCF to provide training to its mental health contractors about the appropriate use of video remote interpreting, to set ethical and therapeutic parameters for use of VRI and provide oversight to ensure VRI (when used) is functional, and that VRI providers are using certified and trained interpreters, and that the VRI service complies with the standards required by 28 C.F.R. §§ 35.160 (d) (1-4);

K. For the malicious and/or reckless conduct described when it engaged in the intentional act of infliction of emotional distress, order Defendants to pay the Plaintiffs economic damages, emotional distress, loss of enjoyment damages, and punitive damages;

L.  Grant Plaintiff Ms. Spell injunctive relief from the violation of her right to Freedom to Exercise of Religion, and order Defendant DCF to pay compensatory damages, emotional distress damages, punitive damages, and other allowable damages for the violations;

M. Grant Plaintiff Ms. Spell injunctive relief from the violations emanating from the Florida Constitution and order the Department of Children and Families to pay compensatory, emotional distress, punitive damages, and or nominal damages;

N.  Order DCF to audit the telephone capabilities at each of its contractors that provided mental health services to Ms. Spell, to ensure videophones are provided, and perform ongoing oversight to make sure videophones are in place, operable, and that the staff knows how to access the videophone;

O.  Grant Plaintiff Ms. Spell injunctive relief from the violations of the Baker Act from Defendants and order Defendants to pay compensatory, emotional distress, punitive, and or nominal damages for those violations;

P.  Award reasonable attorneys' fees and expenses, including expert witness fees as allowed by law, all recoverable statutory costs, interest, and all litigation expenses not otherwise expressly allowed by statute; and

Q.  Grant such other legal and/or equitable relief as the Court may deem just under the circumstances.

## **JURY DEMAND**

Plaintiffs demand trial by jury on all issues which can be heard by a jury.

Dated: May 13, 2026.

Respectfully Submitted,

*/s/ Sharon Caserta*
Sharon Caserta, Esq.
Florida Bar No.: 0023117
Morgan & Morgan,
Deaf/Disability Rights

112

501 Riverside Ave., Suite 1200
Jacksonville, Florida 32202
(904) 361-0078 (Telephone)
(904) 245-1121 (Videophone)
(904) 361-4305 (Facsimile)
scaserta@forthepeople.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify on May 13, 2026, I caused the foregoing to be filed using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record via the Court's CM/EMF filing system.

*Sharon Caserta*
Sharon Caserta